STATE of Tennessee, Appellee,

v.

Elmer L. GROVES, Jr., Appellant.

Court of Criminal Appeals of Tennessee, at Knoxville.

April 24, 1987.

Permission to Appeal Denied by Supreme Court Aug. 3, 1987.

Mary Haber, Stephen F. Palevitz, Vanderbilt Legal Clinic, Vanderbilt School of Law, Nashville, for appellant.

W.J. Michael Cody, Atty. Gen., Wayne E. Uhl, Asst. Atty. Gen., Nashville, Carl K. Kirkpatrick, Dist. Atty. Gen., Phyllis H. Fitzwilson, Asst. Dist. Atty. Gen., Blountville, for appellee.

## OPINION

DUNCAN, Judge.

The appellant, Elmer Groves, Jr., appeals the trial court's decision that he is not eligible for mandatory outpatient treatment and should not be released from the Middle Tennessee Mental Health Institute. This Court has jurisdiction to consider this appeal under T.C.A. § 33–6–110(g) (1984).

The appellant was found not guilty by reason of insanity for the 1980 murder of his father, and he was involuntarily committed to the Department of Mental Health and Mental Retardation. In September, 1984, the appellant was transferred from Lakeshore Mental Health Institute to Middle Tennessee Mental Health Institute (MTMHI) where he remains hospitalized. In the fall of 1985, pursuant to T.C.A. § 33–6–110(c), the superintendent of MTMHI notified the committing court that the appellant was eligible for discharge. A hearing was held in November, 1985, and the trial court found that appellant was not eligible for release. By letter of May 20, 1986, the superintendent once again notified the committing court that, on the basis of two doctors' opinions, the appellant was eligible for release under T.C.A. § 33–6–201 (Supp.1986). Following a hearing on June 17, 1986, the trial court determined that the appellant was not eligible for mandatory outpatient treatment and that the original order of commitment should remain in effect. We affirm the trial court's judgment.

Involuntary commitment under T.C.A. § 33–6–104 is civil in nature and thus, our standard of review is *de novo* upon the record of the trial court with a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. T.R.A.P. 13(d). This standard has been interpreted to mean that the appellate court will affirm the trial court's decision "unless an error of law affecting the result has been committed or unless the evidence preponderates against the trial court's findings of fact." *Roberts v. Robertson County Board of Education,* 692 S.W.2d 863, 865 (Tenn.App.1985). The trial court's resolution of disputed evidence and conflicts in testimony requiring a determination of the credibility of witnesses is binding on this Court unless there is other real evidence to the contrary. *State ex rel. Balsinger v. Town of Madisonville,* 222 Tenn. 272, 435 S.W.2d 803, 807 (1968); *Roberts,* 692 S.W.2d at 865.

Before applying this standard, it is necessary to set out the statutory provisions for involuntary commitment and discharge of a patient from a state mental institution. In order for one to be involuntarily committed in the first instance, two licensed physicians must find that the person poses a "substantial likelihood of harm" as defined

in T.C.A. § 33–6–104(a) (Supp.1986), which provides:

(a) IF AND ONLY IF

(1)(A) a person has threatened or attempted suicide or to inflict serious bodily harm on himself, OR

(B) the person has threatened or attempted homicide or other violent behavior, OR

(C) the person has placed others in reasonable fear of violent behavior and serious physical harm to them, OR

(D) the person is unable to avoid severe impairment or injury from specific risks, AND

(2) there is a substantial likelihood that such harm will occur unless the person is placed under involuntary treatment;

THEN

(3) the person poses a "substantial likelihood of serious harm" for purposes of § 33–6–103 and this section.

Once a person is found to be mentally ill and poses a substantial likelihood of serious harm because of the mental illness, then he or she may be involuntarily committed to a hospital for care, training and treatment of the mental illness. T.C.A. § 33–6–104(b) (Supp.1986). Every six months, the superintendent of the hospital has a duty to examine or cause to be examined a patient who has been committed. T.C.A. § 33–6–108(d) (1984).

The procedures for discharge of an involuntarily committed patient are found in T.C.A. § 33–6–201(b) (Supp.1986), which states:

(b) IF

(1) on the basis of a review of the patient's history before and during hospitalization, the hospital staff concludes that:

(A) the patient is mentally ill or is suffering a mental illness in remission; and

(B) the patient's condition resulting from mental illness is likely to deteriorate rapidly to the point that the patient will pose a likelihood of serious harm as defined in § 33–6–104(a) unless treatment is continued; and

(C) the patient is likely to participate in outpatient treatment with a legal obligation to do so; and

(D) the patient is not likely to participate in outpatient treatment unless legally obligated to do so; and

(E) mandatory outpatient treatment is a suitable less drastic alternative to commitment;

THEN

(2) the patient shall be eligible for discharge subject to the obligation to participate in any medically appropriate outpatient treatment, including psychotherapy, medication, or day treatment, under a plan approved by the releasing facility and the outpatient treating professional.

In addition, if a patient is subject to judicial review because of involuntary commitment by a criminal court, then the patient may only be discharged in conformity with T.C.A. § 33–6–110(c)–(g) 1984.[1] For purposes of this appeal, the pertinent subsections are as follows:

(c) When the superintendent determines that the patient is eligible for discharge under §§ 33–6–109 or 33–6–201, it shall notify the committing court of its conclusion and of the basis for it. Such determination by the department shall constitute a rebuttable presumption of the correctness thereof. The court may, within ten (10) days of receipt of the notice, set a hearing to be held within twenty-one (21) days of receipt of the superintendent's notice. The court shall send notice of the hearing to the patient,

---

1. T.C.A. § 33–6–110(b) states:
   Any patient who was committed involuntarily on the basis of mental illness between April 23, 1980 and July 1, 1982 and was subject to the discharge procedures of § 33–5–310 during that period is subject to discharge only under the procedures of subsections (c) through (g) of this section.
   The appellant in the instant case was committed in December, 1981, so subsections (c) through (g) were applied to determine his release eligibility.

the hospital, the patient's counsel, and the patient's next of kin.[2]

....

(f) Following the hearing, if the court finds by clear, unequivocal, and convincing evidence that the patient is not eligible for discharge under §§ 33–6–109 or 33–6–201, it shall order his return to the hospital under the original commitment. If the court finds otherwise, it shall order the patient's release from involuntary commitment.

(g) Either party may appeal a final adjudication under this section to the court of criminal appeals.

Of particular importance is the fact that the superintendent's decision that a patient is eligible for release is imbued with a rebuttable presumption of its correctness. However, if the trial court finds by clear, unequivocal, and convincing evidence to the contrary, the trial court may order the patient's return to the hospital under the original commitment order.

■ The United States Supreme Court has held that the "clear and convincing" standard of proof is an intermediate standard between "preponderance of the evidence" and "beyond a reasonable doubt." *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). In *Addington*, the Court pointed out that the term "unequivocal" taken by itself, "means proof that admits of no doubt, a burden approximating, if not exceeding that used in criminal cases." *Addington*, at 432, 99 S.Ct. at 1812 (citing *Webster's Third New International Dictionary*). However, the Court also noted that "[t]he subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations." *Addington* at 430, 99 S.Ct. at 1811. *See also Dunson v. Christian*, 419 So.2d 249 (Ala.Civ.App.1982). The reasonable doubt standard is used in criminal cases because it is addressed to specific, knowable facts, but psychiatric diagnosis is based on "impressions." Experts find it difficult, if not impossible, to draw definite conclusions; rather, their standard is "rea-

sonable medical certainty." *Addington*, 441 U.S. at 430, 99 S.Ct. 1811. Thus, the term "unequivocal" is not to be taken literally; it merely raises the level of the clear and convincing standard.

■ Although the Tennessee statute requires the trial court to employ the intermediate standard of "clear, unequivocal and convincing" when weighing the evidence necessary to rebut the presumption of the correctness of the superintendent's decision, it is not necessary that the other evidence be expert testimony. In Tennessee, a trier of fact is allowed to consider lay testimony or evidence of an individual's actions on the issue of sanity. *See State v. Patton*, 593 S.W.2d 913, 916 (Tenn.1979); *Edwards v. State*, 540 S.W.2d 641, 647 (Tenn.1976); *State v. Phillips*, 672 S.W.2d 427, 437 (Tenn.Cr.App.1984).

■ In the present case, after the hearing on the issue of appellant's release, the trial court set forth its findings of fact and final judgment. In the trial court's opinion, the appellant was not eligible for release because he is "in a state of residual schizophrenia and is symptomatic; that he would pose a likelihood of serious harm ... unless treatment continues; further, that neither voluntary nor mandatory outpatient treatment is a suitable less drastic alternative to continued commitment." The trial court found that the opinions of the two expert witnesses, Dr. John Filley, a psychiatrist, and Dr. Rama Naidu, a medical doctor, were not supported by the facts. We agree.

Dr. John T. Filley, the Assistant Superintendent for Clinical Services at MTMHI, testified that it was his opinion that the appellant was eligible for release under a mandatory outpatient treatment program. He based his opinion on two interviews with the appellant; a one hour interview on May 9, 1986, and a twenty minute interview the week prior to the hearing. Of course, Dr. Filley also had access to all the daily ward reports on appellant. Dr. Filley

---

**2.** We note that the district attorney is not on this notification list; however, in the present case, the district attorney received notice, filed a mo-

tion for a hearing under this section, and was a party to the proceedings.

stated that the appellant is suffering from residual schizophrenia. All major symptoms have remitted but there is still some evidence of slight thought disorders. Appellant is presently taking an anti-psychotic drug, Trilafon, which is responsible for reducing the degree of impairment of his thought processes. This impairment is the major feature of schizophrenia. Appellant does not appear to accept the contention that medication may be keeping him from being more significantly disturbed.

Dr. Filley noted at the time of the first interview that, although appellant still cannot think abstractly and still has a poverty of speech (lack of ability to vary expression), there was no evidence of emotional withdrawal. His appearance was acceptable, and his affect was reasonably appropriate and responsive. Dr. Filley was not aware of any assaultive behavior or suicide threats or attempts. Appellant did not seem to be attending to voices or other internal distracting thoughts and there was no evidence of major delusions.

Appellant claimed that he no longer heard "voices" but Dr. Filley was unsure whether this was true or if appellant was covering up. Appellant murdered his father because "voices" told him to do so. Appellant still believes that the "voices" that told him to murder his father were real.

When appellant was asked about his future plans, assuming he were to be released, he answered that he might get into the concrete molding business or be a professional baseball player.

From the daily ward reports, Dr. Filley determined that appellant was able to function in the community. Appellant worked outside the hospital grounds for about a year as a cook at a Waffle House until restricted because of marihuana use. As a matter of fact, appellant has a continuing problem with marihuana use. Marihuana has shown up in his urine samples every two weeks since January, 1986. He was caught smoking marihuana in the hospital, bringing it into the hospital, and distributing it to other patients. Although the hospital staff threatened appellant with prosecution for his marihuana possession, no action was ever taken other than restricting his privileges.

Dr. Filley also noted that appellant "has not done well in terms of complying with ward rules. He comes in late from work and does not notify staff." Also, appellant has "eloped" from the hospital (left without permission) in the last year but he has always returned on his own. Dr. Filley testified that appellant is untruthful at times, especially when it is to his advantage.

In May, 1986, appellant was caught in a female patient's room located on a floor of the hospital where he should not have been.

On March 27, 1986, appellant told his social worker that there was a conspiracy against him. He stated that there has been "bloodshed before in the White House" and this was the way he was brought up. Again, on May 5, 1986, after appellant was restricted from going to work because of marihuana possession he entered the nursing station without permission and "became very angry, hostile and agitated" when told he could not leave the hospital grounds. He started "pacing very fast up and down the hallway." He said that if he was not allowed to work off the grounds, that he would kill all the day staff because it was their fault.

In spite of all this evidence, Dr. Filley concluded that appellant no longer posed a significant threat of serious harm to himself or others and would participate in a mandatory outpatient treatment program if legally required to do so.

Dr. Rama Naidu, a medical doctor in charge of the ward where appellant is hospitalized, testified that she also recommends that appellant be released. She has worked with appellant since November, 1985, and sees him approximately three times a week. She agrees with Dr. Filley's findings.

Dr. Naidu stated that the threats he made were related to anger and she is not afraid of him because she does not expect him to carry out his threats.

Overall, Dr. Naidu believes that appellant abides by a number of rules and "has really not caused much trouble." In her opinion, appellant seems to be more in control and calmer when he is allowed to go to work.

Dr. Naidu concurs that appellant does not meet the commitment criteria and that he would participate in mandatory outpatient treatment if legally required to do so.

Wilma Lane, a registered nurse in charge of appellant's ward, testified that she has known appellant since March, 1985, and he was in her area until she left MTMHI in May, 1986. Ms. Lane testified it was her opinion, and that of the ward staff, that appellant should not be released. She identified several bases for this opinion.

First, appellant *never* complied with rules and regulations. He constantly pushed the limits of the rules to get away with as much as he could. Ms. Lane repeatedly asked that he be restricted because he refused to stay on a work schedule. Second, Ms. Lane was involved in the May 5th situation when appellant threatened to kill the day staff. She testified that she and two other females (a L.P.N. and an aide) were the only staff on duty that day. They took the precaution of going into the nursing station because appellant was pacing up and down the hall. He entered and became very angry, hostile, and agitated when the L.P.N. told him that they could not do anything until a staff meeting. "He said that he had killed his father and that he would kill again." Appellant accused them of being responsible for his restriction and told them "he was mad at everybody then, and that he would kill everybody on the day shift." Ms. Lane felt that appellant was ready to back up his threats, so they locked the front nursing station and were prepared to call for help if needed.

Ms. Lane also testified that he constantly paces when he is restricted and talks to himself, as if he is carrying on a conversation with a missing person. In the fifteen months that she worked with appellant, she was unable to detect any improvement in his behavior.

Ms. Lane testified that although she believes in mandatory outpatient treatment, she could not recommend it for violent mental patients like appellant.

Appellant's mother, Martha Groves, and aunt, Elsie Mumpower, also testified. They visited with him for about an hour on June 4, 1986, just prior to the hearing. They first noticed that his right arm was "drawn" (later explained by Dr. Naidu as a possible attempt to hide something), and that he was pacing. Mrs. Groves, appellant's mother, was very concerned because pacing was always noticed prior to one of his "bad spells." In the past, he would begin pacing and then start talking to himself.

Both Mrs. Groves and Mrs. Mumpower found him slow to answer their questions; he was very distracted. It was Mrs. Groves' opinion that he was mentally ill at the time of this visit because he was not under control. Mrs. Groves testified that he was behaving like he did in the month before he killed his father. Mrs. Mumpower also testified that, at the time of this visit, appellant was behaving like he did in the months prior to the murder. Appellant stayed with her for awhile after he "escaped" from a Virginia mental institution. He paced, "there was something else on his mind when she tried to communicate with him," and he was unable to respond to questions. She noticed all these same behaviors at the time of the June visit.

Mrs. Groves said that appellant called her at the end of April or the beginning of May and told her he was going to leave the hospital. He said that "they" were conspiring against him and he was going to Mexico. He also told her "If I can't get away from here, I am going to kill myself. I'm not going to stay here in the institution." The telephone call prompted her to go to Nashville to see him.

Mrs. Groves and her sister testified that Dr. Naidu told them that appellant was being released because his bed was needed for someone else.

An affidavit from the manager of the Waffle House where appellant worked was

entered into evidence. The manager said that appellant performed his job well and responsibly and got along well with others. He stated that he would hire appellant again if he is released.

From our review of the witnesses' testimony as set out above, we agree with the trial court that there was clear, unequivocal, and convincing evidence that appellant does not meet the discharge criteria set out in T.C.A. § 33–6–201(b).

First, there must be a finding that the patient is mentally ill or suffering a mental illness in remission. There is no question that the appellant is suffering from residual schizophrenia. The second criteria requires a finding that the patient's condition will deteriorate rapidly to a point that the patient will pose a likelihood of substantial harm unless treatment is continued. In this case, Dr. Filley testified that the antipsychotic drug that appellant is taking is responsible for reducing his thought impairment. Third, it is necessary to conclude that the patient will participate in outpatient treatment if legally obligated to do so. The evidence presented at the appellant's hearing is clear, unequivocal, and convincing that appellant would *not* participate in outpatient treatment even if legally obligated to do so. Both doctors and the ward nurse testified that one of the problems with appellant's behavior is his constant failure to follow rules and regulations. He does not obey simple rules such as getting up on time nor serious rules prohibiting bringing marihuana into the hospital and distributing it. In addition to appellant's almost total disregard of hospital rules, he has a history of "eloping" from the hospital. Also, prior to the murder of his father, appellant would leave hospitals and disappear for weeks at a time. There is nothing in the record to show that defendant would keep his appointments or take his medication on an outpatient basis. We note that Dr. Filley testified that his medication is keeping him from being more significantly disturbed. Without his medication, it is more than likely that appellant would pose a substantial likelihood of serious harm to himself or others. Importantly, appellant does not believe that his medication is helping him.

In light of our finding of fact on this discharge criterion, it is unnecessary to consider the remaining criteria. *See* T.C.A. § 33–6–201(b)(1)(D) and (E) (Supp.1986).

In addition, there is evidence in the record that appellant still meets the commitment criteria, T.C.A. § 33–6–104 (1984), in that he poses a substantial likelihood of serious harm. He made suicide and death threats in the month prior to the hearing. And there is some evidence that he might be hearing "voices" whether he admits it or not.

We affirm the trial court's judgment that there was clear, unequivocal, and convincing evidence that appellant should not be released from MTMHI at this time.

O'BRIEN and SCOTT, JJ., concur.