IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 10, 2001 Session

# TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES v. M.A.D., IN THE MATTER OF: A.M.D., A.L.D., and A.N.D.

**Appeal from the Juvenile Court for Greene County**
**No. 13574      Thomas Wright, Judge**

**FILED MAY 17, 2001**

**No. E2000-02501-COA-R3-JV**

The State of Tennessee, Department of Children's Services ("Department") obtained temporary custody of the three minor children of M.A.D. ("Mother") after she was arrested and the children's father was already in jail. A Permanency Plan ("Plan") was developed which required Mother to take several affirmative steps in order to regain custody and provide an appropriate home for her children. When Mother failed to comply with the Plan, the Juvenile Court terminated her parental rights after concluding there was clear and convincing evidence that there had been substantial noncompliance by Mother with the Plan. The Juvenile Court also found clear and convincing evidence that the conditions which led to the children's removal still persisted and prevented the children's safe return to Mother, that there was little likelihood that these conditions would be remedied at an early date so that the children could be returned safely to Mother, and that continuing the parent/child relationship would greatly diminish the children's chances of early integration into a safe, stable and permanent home. The Juvenile Court also concluded there was clear and convincing evidence that termination of Mother's parental rights was in the best interests of the three children. Mother appeals the termination of her parental rights. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Juvenile Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

J. Gregory Bowman, Greeneville, Tennessee, for the Appellant M.A.D.

Paul G. Summers and Dianne Stamey Dycus, Nashville, Tennessee, for the Appellee State of Tennessee, Department of Children's Services.

# OPINION

## Background

On December 15, 1998, the Department filed a petition seeking temporary custody of Mother's three minor children, claiming they were dependent and neglected after Mother had been arrested and the whereabouts of the children's father being unknown at that time.  A.M.D. was born on 02/26/93, and twins A.L.D. and A.N.D. were born on 12/19/95.  The Juvenile Court granted the petition and temporarily transferred custody to the Department.  Both parents, who were in jail, were appointed separate counsel due to their indigent status.

A Plan was developed so that the custody of the three minor children could be returned to Mother.[1]  The Plan required Mother to achieve certain positive changes and provided a date on which most of the items were to be completed. In relevant part, the Plan required Mother to:

1. Make sure the children were adequately supervised when left in the care of others and were never left alone (5/15/99 completion date);

2. Maintain and locate safe and stable housing with sufficient room for all three children (5/15/99 completion date);

3. Not participate in any criminal or illegal activity and abide by any terms of probation/parole (12/27/98 completion date);

4. Refrain from associating with people participating in any criminal or illegal activity (12/27/98 completion date);

5. Participate in family and individual therapy once released from jail;

6. Participate and complete counseling for drug addiction and attend Narcotics/Alcoholics Anonymous;

7. Obtain a GED (7/15/99 completion date);

8. Attend and complete parenting classes;

9. Locate and maintain stable employment once released from jail; and

---

[1] The action concerning the father's parental rights was eventually severed from this action and is not at issue in this appeal.  Accordingly, we address the Plan only as it pertains to Mother.

10.     Receive money management training (7/15/99 completion date).

On January 27, 1999, Mother signed the Plan after its contents were explained to her. In September of 1999, the Juvenile Court reviewed Mother's progress towards completing the Plan. While noting that some progress had been made, the Juvenile Court stated that Mother was not in compliance with the Plan and ordered the children to remain in foster care. On November 10, 1999, the Department filed a petition seeking to terminate Mother's parental rights, claiming that Mother had abandoned the children by willfully making no contribution towards their support for four consecutive months preceding the filing of the petition. The Department further alleged that Mother failed to comply in any substantial manner with the requirements set forth in the Plan, had not made reasonable efforts to provide a suitable home for her children, and that it was unlikely Mother would be able to do so. The Department also claimed that the children had been removed by court order for six months and the conditions which led to their removal still persisted with little likelihood that these conditions would be remedied at an early date.

The hearing on the petition to terminate Mother's parental rights was initially scheduled for June 14, 2000. Mother requested a continuance on the basis that "she has been incarcerated for a substantial portion of the time following the receipt of the Petition to Terminate her parental rights, and that she was incarcerated at the time of the Court's determination of the dependency and neglect of her children." Mother essentially claimed that she did not have enough time when she was not in jail to comply with the Plan. On May 17, 2000, the Juvenile Court orally granted the continuance, and at the same time allowed Mother supervised visitation with her children. Since Mother had become employed, the Juvenile Court also ordered her to pay child support in the amount of $345.00 per month to Becky Smith, the foster parent with whom the children were residing.

At the hearing on the Department's petition to terminate Mother's parental rights, the caseworker assigned to the case by the Department, Ms. Leilani Mooneyham ("Mooneyham"), was called to testify. Addressing Mother's progress towards the various items set forth in the Plan, Mooneyham stated that to her knowledge, Mother never found anyone to supervise her children in her absence in the event she were to re-obtain custody. Mother had lived in eight or nine different places since the Plan was developed.[2]

The most recent contact Mooneyham had with Mother was during a supervised visitation on June 8, 2000. Mooneyham testified that Mother had not obtained any of the counseling that was required by the Plan, had not attended any Narcotics/Alcoholics Anonymous meetings, and had not obtained a GED. Apparently, Mother had started to attend AA meetings and GED classes shortly before to the hearing, but Mooneyham had not been informed of this. Mooneyham was

---

[2] Mooneyham indicated that she had minimal contact with Mother after the Plan was developed because Mother failed to contact her and moved around without informing Mooneyham of her new location. Because of this, Mooneyham was not aware of Mother's last minute attempts to comply with some of the requirements of the Plan. When asked where was the easiest place to find Mother, Mooneyham replied "Greene County Jail."

aware that Mother failed a drug test on May 17, 2000. Mooneyham had no knowledge of Mother attending parenting or money management classes and had not been provided with any proof showing that Mother had secured stable employment. Mooneyham was not aware of any child support payments made by Mother. Mooneyham recalled a couple of times when Mother did not show up for scheduled visitations and no one knew where she was, although it was later learned that at least one of the missed visitations was because Mother was in jail. Mooneyham described Mother as uncooperative and indicated that Mother would get upset when she was required to do something and would give excuses why she could not do what was asked.

When the children were first taken from Mother's custody, Mooneyham described them as tired. They were wearing dirty clothes, their hands and faces were dirty, and only one of the three children was wearing shoes, and those did not fit. The children were eating M & M's and were hungry. The children were placed in foster care with Jimmy and Becky Smith. Mooneyham described the children as "clingy" to Ms. Smith. The children were playful and were engaging in age appropriate activities at the Smith home. Mooneyham described the children as "happy" while living with the Smiths.

Ms. Patty Hayes ("Hayes") with the Greene County Health Department, Child and Health Development also testified. Hayes became involved with Mother and her three children shortly after the twins were born. When Hayes initially became involved, she described the children as doing well the first year. Then, matters began to change. Mother's housing situation was not stable and there was no stable income. The development and learning skills of the children began to slow down to the point that Hayes recommended early learning programs for the twins. Hayes also testified that since the children began living with Ms. Smith, they have "made some very good strides." The children are "very open, they're very exuberant children. They seem very relaxed, have wonderful, good color, just look very, very healthy and well cared for." Hayes described the Smiths' home as very nice, with each child having their separate room.

Penny Collins ("Collins"), a Social Counselor with the Grainger County Health Department testified that she was involved with the children for an eight month period from March until November of 1999. She became involved with the children at the request of Ms. Smith. Collins testified that the children were withdrawn and had sad looks on their faces when she first began working with them. By November, they were laughing and smiling and had grown very attached to Ms. Smith.

Ms. Smith testified that she first became involved with the children when their Grandmother began calling around to see if she could find someone to take care of the children after Mother was arrested. When the children first came to live with her, they were very withdrawn. One of the children would take his food and hide under the table to eat it. She described the children as doing very well at the time of the hearing. They attended church and sang. Ms. Smith testified that in the event the parental rights of the children's parents were terminated, she and here husband were hopeful that they could adopt them. Ms. Smith also testified that Mother requested to see the children more often than set forth in the visitation schedule. On three or four occasions, however,

Ms. Smith had taken the children to the Department for a visit with Mother, and Mother did not show up. This upset the children, and they cried. Ms. Smith testified that she never received any financial assistance from Mother.

The oldest child, A.M.D., who was seven years old at the time of the hearing, was allowed to testify because he wanted to tell the Judge about where he was living and where he wanted to live. A.M.D. testified that his parents "right now" were Becky and Jimmy Smith, and they helped him with his homework. When asked to describe living with Mother, he said it was "not good" because she left them all the time "all by ourselves." A.M.D. and his two younger siblings would go look for Mother and find her at various different apartments. They had just "a little bit" of food - "not that much." Sometimes he was hungry, and sometimes he was scared. Sometimes he would change his little brother's diaper "Because my mom wouldn't." A.M.D. went on to testify that at the Smiths' house, they have "a lot of food" and he described it as "good food". He described his visits with Mother as pretty good. When asked where he would prefer to live, A.M.D. stated with "Becky and Jimmy" because they were good to him. On cross-examination, A.M.D. testified that he liked living with Mother, but did not like living in "different apartments" because some people there "wasn't nice and stuff." In addition to his father, A.M.D. said there have been two other men who stayed at their house with Mother, and he did not like them because they were mean to him.

Mother testified that she remained in jail after being arrested until March 17, 1999. She agreed to the terms of the Plan while in jail. Mother returned to jail from July 22, 1999 to August 4, 1999, after being arrested for theft, public intoxication, evading arrest, and simple possession of marijuana. She then served a couple of weekends in jail during September and October of 1999 for probation violations which included failing a drug test, failing to pay probation fees and court costs, and failing to appear in Court. She was again in jail for violation of probation from January 21, 2000, until March 17, 2000. She returned to jail on March 30, 2000, because of yet another probation violation, and remained in jail until May 10, 2000. On May 17, 2000, she tested positive for marijuana on a drug test.

Mother admitted that she had never paid any child support. She denied leaving the children alone except for a couple of occasions where she left them for a few minutes to check the mail. Mother stated that within the 30 days prior to the hearing, she had taken steps to comply with the Plan. She was taking GED classes at Greeneville High School and had signed up to take parenting classes. She was employed by a bottling company and had been working there for about three weeks, after having worked at several different places (when not in jail) through a temporary agency. Mother stated that she had not taken any money management classes because she was told she needed insurance to cover the cost. She began attending AA meetings two weeks prior to the hearing. Mother was staying with a friend named Johnny Owens at the time of the hearing, but testified that later that week she would be moving into a trailer. Mother stated that after getting out of jail the last time (May 10, 2000), she had not missed any scheduled visits with her children. She only recalled two times she missed visitations that had been scheduled at the Department, one of those being when she was arrested for violating her probation by failing a drug test. Mother admitted that the Juvenile Court had been giving her chances for almost two years to try to maintain her

parental rights. She claimed that she could provide a safe and stable home for her children if she "got all of it together" and was asking for one more chance.

Based on the foregoing testimony of the various witnesses, the Juvenile Court found that there was clear and convincing evidence to terminate Mother's parental rights. The Juvenile Court found that Mother abandoned the children by her willful failure to pay child support or make reasonable payments towards the support of the children for a period of four consecutive months as set forth in T.C.A. § 36-1-102 (1)(A)(I) and § 36-1-113(g)(1). The Juvenile Court also found that the children were removed from the home as a result of a petition being filed and were found to be dependent and neglected. They were placed in the custody of the Department, and reasonable efforts were made by the Department to prevent removal and to help Mother establish a suitable home for the children. Mother, however, demonstrated a lack of concern for the children to such a degree that it appeared unlikely she would be able to provide a home for them. No child support payments were made, even after Mother was ordered by the Juvenile Court to do so. The Juvenile Court also found substantial non-compliance by Mother with the terms of the Plan because she never made any real progress on any of its requirements. T.C.A. § 36-1-113(g)(2). The Juvenile Court observed that:

> She still doesn't have a stable home. She still doesn't have the counseling. She still doesn't have the drug addiction counseling. She still doesn't have the GED classes or her certificate. She still hasn't had the parenting classes. She still hasn't had the nutrition/meal preparation education. She still hasn't had the money management classes. She's never been able to keep steady employment. She's never paid any child support. She didn't maintain contact when she was supposed to at all times with the Department regarding her whereabouts, and that's partly because her whereabouts have been constantly shifting, and she has failed obviously to keep from engaging in illegal activity and negative associations, as evidenced by the criminal history that appears in the record . . . . In the past year [she] has been to court five times in the past year for six criminal charges and two violations of probation . . . .

The Juvenile Court also ruled that grounds existed to terminate Mother's parental rights pursuant to T.C.A. § 36-1-113(g)(3) because the children had been removed from Mother's home by court order for more than six months, the conditions leading to their removal still persisted, and there was a reasonable probability that the children would be subject to further abuse or neglect if they were returned to Mother. The Juvenile Court also found there was little likelihood that these conditions, including Mother's substance abuse, would be remedied at an early date, and continuing the parent/child relationships would greatly diminish the ability of the children to integrate into a safe, stable, and permanent home.

Considering the various factors set forth in T.C.A. § 36-1-113(i) pertaining to the best interests of the children, the Juvenile Court concluded that Mother had not made such an adjustment

of circumstances, conduct or conditions as to make it safe and in the children's best interests to return home to Mother. She failed to effect a lasting adjustment after reasonable efforts by the Department. Mother did, however, maintain regular visitation with the children and a meaningful relationship had been established between Mother and her children. The Juvenile Court determined that it would have a negative emotional and psychological impact on A.M.D. to change his caretakers. The Juvenile Court concluded that Mother's use of alcohol or controlled substances may render her consistently unable to care for the children in a safe and steady manner. Finally, the Juvenile Court pointed out that Mother had not paid any child support. After considering these factors, the Juvenile Court concluded that it would be in the best interests of the children to terminate Mother's parental rights.

On August 9, 2000, the Juvenile Court entered a final Order terminating Mother's parental rights, and Mother appeals that Order. The issues on appeal are whether the Juvenile Court erred in finding that there was clear and convincing evidence to terminate Mother's parental rights and whether there was clear and convincing evidence that such termination was in the children's best interests.

### Discussion

A review of findings of fact by a trial court is *de novo* upon the record of the trial court, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Brooks v. Brooks*, 992 S.W.2d 403, 404 (Tenn. 1999). Review of questions of law is *de novo*, without a presumption of correctness. *See Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

Termination of parental or guardianship rights must be based upon: (1) a finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) that termination of the parent's or guardian's rights is in the best interests of the child. T.C.A. § 36-1-113(c). Before a parent's rights can be terminated, there must be a showing that the parent is unfit or that substantial harm to the child will result if parental rights are not terminated. *In Re: Swanson,* 2 S.W.3d 180, 188 (Tenn. 1999); *In the Matter of M.W.A., Jr.,* 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

This Court discussed the "clear and convincing evidence" standard in *O'Daniel v. Messier,* 905 S.W.2d 182 (Tenn. Ct. App. 1995):

> The "clear and convincing evidence" standard defies precise definition. *Majors v. Smith,* 776 S.W.2d 538, 540 (Tenn. Ct. App. 1989). While it is more exacting than the preponderance of the evidence standard, *Santosky v. Kramer,* 455 U.S. at 766, 102 S. Ct. at 1401; *Rentenbach Eng'g Co. v. General Realty Ltd.,* 707 S.W.2d 524, 527 (Tenn. Ct. App. 1985), it does not require such certainty as the beyond a reasonable doubt standard. *Brandon v. Wright,* 838

S.W.2d 532, 536 (Tenn. Ct. App. 1992); *State v. Groves,* 735 S.W.2d 843, 846 (Tenn. Crim. App. 1987).

Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *See Hodges v. S. C. Toof & Co.,* 833 S.W.2d 896, 901 n. 3 (Tenn. 1992). It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established. *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn. Ct. App. 1993); *Brandon v. Wright,* 838 S.W.2d at 536; *Wiltcher v. Bradley,* 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985).

*O'Daniel v. Messier,* 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995).

Initiation of termination of parental or guardianship rights may be based upon any of the following three grounds:

(1)     Abandonment by the parent or guardian, as defined in [applicable case law], has occurred;[3]

(2)     There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

>     (i)     The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

>     (ii)     There is little likelihood that these conditions will be remedied at an early date so that the child can be

---

[3] As discussed in more detail *infra*, the statutory definition of "abandonment" referenced in this statute has been declared unconstitutional. Hence, we have substituted "applicable case law" to reference the case law which is to be applied until the statute is amended by the legislature.

safely returned to the parent(s) or guardian(s) in the near future; and

(iii)     The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

T.C.A. § 36-1-113(g). That statute also describes the standard for determining whether termination is in the best interest of the child in such cases:

(i)     In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

T.C.A. § 36-1-113(i).

We agree with the Juvenile Court's decision to terminate Mother's parental rights because of substantial noncompliance by Mother with the requirements of the Plan. T.C.A. § 36-1-113(g)(2). The Plan set forth corrective action that needed to be taken in order for Mother to adequately take care of her children and regain custody. This Plan was explained to Mother, and she agreed to its terms. According to the Plan, Mother was required to: stay drug and crime free, obtain various types of counseling or classes designed to address specific deficiencies (e.g., parenting classes, money management classes, counseling for drug addiction), and secure a stable home in which to raise her three children. Not a single one of these items had been accomplished by the time the petition to terminate Mother's parental rights was filed on November 10, 1999. Eight months later at the July 19, 2000, hearing on the petition, Mother still had not completed any of these requirements. She had attended AA meetings for two weeks, but had not obtained drug addiction counseling which also was required by the Plan. She was in the process of taking GED classes, and signed up for parenting classes, but certainly had completed neither. She had not obtained a stable home for the children to live and was staying with a male friend at the time of the hearing. Mother repeatedly violated the conditions of her probation, was in and out of jail on numerous occasions, and failed two drug tests. She had been employed at her most recent job for only three weeks.

Based on Mother's unwillingness to comply even remotely with the Plan, the conditions leading to the removal of the children were as prevalent at the time of the hearing as they were when the children were originally removed from the home. Given the fact that she no longer had her own place to live and was staying temporarily with a male friend, they were even worse. There is no evidence that these problems would be remedied at an early date. There is no evidence that attending AA meetings for two weeks provided any sort of likelihood that Mother would remain

drug free. This is even more apparent given the fact that she failed two drug tests while on probation, with the most recent test occurring just seven days after being released from jail and only two months before the hearing on the petition to terminate her parental rights. There was a reasonable probability that the children would be subject to the same neglect if returned to Mother.

We find no error in the Juvenile Court's determination that the Department had proven by clear and convincing evidence that Mother's parental rights were subject to termination in accordance with both T.C.A. §§ 36-1-113(g)(2) and (g)(3).

In *In re: Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999), our Supreme Court ruled that the definition of "abandonment" found in the adoption statute was unconstitutional because it created an irrebuttable presumption "that the failure to provide monetary support for the four months preceding the petition to terminate parental rights constitutes abandonment, irrespective of whether that failure was intentional . . . ." The Court further held that the definition of "abandonment" under prior law should be applied until the statute is amended by the legislature. *Id*.

This Court recently discussed the applicable standard to be applied in light of the unconstitutionality of the term "abandonment" in the current statute. Specifically, this Court stated:

> Abandonment, as it pertains to an adoption proceeding, is defined in this state as any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. Evidence of an abandonment must be clear and convincing. The evidence must clearly show a conscious disregard or indifference to the parental obligations for a court to forfeit the parental rights and obligations. To determine an abandonment the court is not to look at the protestations of affections and intentions expressed by the natural parents, but look at the past course of conduct. [Footnote and citations omitted.]

*In re Satterwhite*, 2001 WL 387389, No. E2000-02107-COA-R3-CV (Tenn. Ct. App. April 17, 2001) (quoting *Koivu v. Irwin*, 721 S.W.2d 803, 807 (Tenn. Ct. App. 1986)). The *Satterwhite* Court went on the explain that:

> Before the passage of Tennessee's amended adoption statute, "abandonment" was based upon seven factors.
>
> > To determine whether the parent's conduct had evinced "a settled purpose to forego all parental duties and to relinquish all parental claims to the child," the courts developed several factors: (1) the parent's ability to support the child; (2) the amount of support

-11-

> provided; (3) the extent and nature of the contact between the parent and the child; (4) the frequency of gifts; (5) whether the parent voluntarily relinquished custody of the child; (6) the length of time the child has been separated from the parent; and (7) the home environment and conduct of the parent prior to removal. *See O'Daniel v. Messier*, 905 S.W.2d 182, 187 (Tenn. Ct. App. 1995).

*Satterwhite*, 2001 WL 387389 at *3-4 (citing *In re: Swanson*, 2 S.W.3d at 184). It appears from the record that the Juvenile Court applied the statutory definition of abandonment that was held to be unconstitutional in *In re: Swanson, supra*, and, therefore, we vacate that portion of the Juvenile Court's opinion. We need not remand this case to the Juvenile Court for a determination utilizing the seven factors listed above on whether Mother abandoned her children because we have affirmed the Juvenile Court's judgment that other statutory grounds for termination are met under T.C.A. §§ 36-1-113(g)(2) and (g)(3).

Having affirmed the judgment that two of the three statutory grounds for termination of Mother's parental rights were proven by clear and convincing evidence in this case, we now turn to whether termination of Mother's parental rights was in the children's best interests. Applying those statutory factors which are relevant in this case, the Juvenile Court concluded that: (a) Mother had not made such an adjustment of circumstances, conduct or conditions as to make it safe and in the best interests of the children to return home (T.C.A.§ 36-1-113(i)(1)); (b) Mother had failed to effect a lasting adjustment after reasonable efforts by the Department for a period of time so that a lasting adjustment did not appear reasonably possible (T.C.A.§ 36-1-113(i)(2)); (c) Mother had maintained regular visitation or other contact with the children (T.C.A.§ 36-1-113(i)(3)); (d) a meaningful relationship had been established between Mother and her children (T.C.A.§ 36-1-113(i)(4)); (e) a change of caretakers and physical environment would likely have a negative impact on the oldest child (T.C.A.§ 36-1-113(i)(5)); (f) that the physical environment of Mother's home (or lack thereof) was not healthy and safe and there was use of alcohol or controlled substances that would render Mother consistently unable to care for the children (T.C.A.§ 36-1-113(i)(7)); and (g) Mother had not paid any child support even after being ordered by the Court to do so (T.C.A. § 36-1-113(i)(9)). We find no error in the Juvenile Court's decision that the evidence was clear and convincing that it was in the best interests of the three children for Mother's parental rights to be terminated.

## **Conclusion**

The Judgment of the Juvenile Court is affirmed. This case is remanded to the Juvenile Court for further proceedings as necessary, if any, consistent with this Opinion. Costs on appeal are taxed to M.A.D. and her surety, if any.

_____
D. MICHAEL SWINEY