IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 21, 2011 Session

## STATE OF TENNESSEE v. KENNETH RYAN MALLADY

**Appeal from the Circuit Court for Hickman County**
**No. 045035CR    Robbie T. Beal, Judge**

_____

**No. M2010-02142-CCA-R3-CD - Filed January 10, 2012**

_____

Defendant-Appellant, Kenneth Ryan Mallady, was found not guilty by reason of insanity for the offenses of first degree premeditated murder, attempted first degree premeditated murder, and aggravated assault. He appeals the trial court's order denying discharge from involuntary commitment under the terms of a mandatory outpatient treatment program. Mallady argues that the trial court's finding that he was unsuitable for discharge was in error because it contradicted the clear weight of the evidence. Upon review, we reverse the judgment of the trial court and remand for the entry of an order discharging Mallady to mandatory outpatient treatment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Joe Napiltonia, Nashville, Tennessee, for the Defendant-Appellant, Kenneth Ryan Mallady.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Kim R. Helper, District Attorney General; and Michael J. Fahey, II, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Background.** On September 9, 2003, Mallady killed his mother and seriously injured his stepfather, acts which he admitted doing. Following a bench trial for first degree premeditated murder, attempted first degree premeditated murder, and aggravated assault, he was found not guilty by reason of insanity and was committed to the Middle Tennessee Mental Health Institute (MTMHI). Approximately three and a half years later, in April 2010,

the chief executive officer of MTMHI notified the court of her intent to furlough Mallady and discharge him under a mandatory outpatient treatment program, pursuant to Tennessee Code Annotated section 33-6-708(c)(1). Mallady's furlough began on April 29, 2010. At the State's request, the court held a hearing in August 2010 to review Mallady's suitability for discharge.

Dr. Mohammed Jahan, the clinical director at MTMHI, testified at the hearing that Mallady suffered from paranoid type schizophrenia. Mallady's treatment team at MTMHI, including psychiatrists, nurses, and social workers, believed Mallady was ready for discharge and developed a plan for continuing treatment. They then requested that Dr. Jahan provide a second opinion on both Mallady's suitability for discharge and the details of the treatment plan. Dr. Jahan concluded, in agreement with the treatment team's recommendation, that Mallady should be discharged to mandatory outpatient treatment. He based this conclusion on a number of considerations. Mallady's records showed steady improvement in his condition since he first came to the facility. Within weeks of being properly medicated, Mallady was transferred to a less restrictive area of MTMHI, and he had not experienced any psychotic episodes since that time. Additionally, all five doctors that had treated Mallady decided that he responded well to medication and "his mental status [was] clear." None of Mallady's psychological evaluations since soon after he arrived indicated evidence of psychosis. Moreover, Mallady had complied "A to Z, all the time" with instructions regarding his treatment and the rules of MTMHI. He had always taken his medicine. He worked at various jobs in MTMHI and served as a counselor to his peers. Finally, Dr. Jahan personally interviewed Mallady and conducted a "mini-mental status examination," in which Mallady performed well. From all this, Dr. Jahan concluded that Mallady's mental "stability [was] cemented," that he was not a risk to himself or to others, and that there was no evidence that Mallady needed to remain at MTMHI.

Dr. Jahan also approved the continuing treatment measures that constituted Mallady's "discharge plan." These measures required Mallady, among other things, to live in a supervised boarding facility, take his medicine, submit to drug screens, follow all instructions of his treating professionals, abstain from alcohol and drug use, and participate in programs designed to educate him and treat his illness. If Mallady failed to comply with these mandates, his treatment coordinator would return him to MTMHI if necessary.

Dr. Jahan described Mallady's illness as incurable. However, he said that those with paranoid type schizophrenia generally have a "good prognosis" compared to those with other types of schizophrenia. Mallady must take his medication, Seroquel, on an ongoing basis to treat the symptoms, and his condition could possibly deteriorate should he stop taking the medication. Approximately ten to fifteen percent of patients similar to Mallady experience a deterioration in their condition despite properly taking the medication.

Dr. Jahan testified that, in determining Mallady's suitability for discharge, he considered the serious nature of the acts Mallady committed. However, Mallady was not receiving any kind of treatment or medication when he attacked his mother and stepfather. Since receiving treatment, Mallady had progressed well and his condition had improved.

On cross-examination by Mallady's counsel, Dr. Jahan testified that Mallady's condition was in remission and had been since he was transferred to the less restrictive unit of MTMHI. Since then, Mallady had not threatened or attempted any form of violence, including suicide, homicide, or other harm. He was not a risk to anyone, and he no longer met any criteria for continued inpatient treatment. Dr. Jahan opined that Mallady was likely to participate in outpatient treatment and comply with its terms, just as he had done since April 2010. According to Dr. Jahan, mandatory outpatient treatment was a suitable alternative to treatment at MTMHI.

Dr. Narcisco Gaboy, Mallady's treating psychiatrist at MTMHI and part of the treatment team that initially recommended outpatient treatment, testified consistently with Dr. Jahan's testimony. He met with Mallady a total of six times, starting in March 2010. Dr. Gaboy described the symptoms of Mallady's affliction as delusions that "Russian[s] [were] after him," his food was poisoned, and people around him were impostors. Mallady's sickness was treatable with medicine, but he could relapse if he stopped taking the medicine. Dr. Gaboy testified that treatment at MTMHI emphasized educating patients on the possibility of relapse and how to identify it. As a result, Mallady knew the symptoms to look for and when to seek treatment. Furthermore, according to Dr. Gaboy, the early signs of relapse would be apparent to those supervising Mallady's care at the boarding facility where Mallady would reside, and they would be able to intervene early. Dr. Gaboy testified that it was possible for Mallady's medication to suddenly become ineffective even though it had been effective in the past. Dr. Gaboy did not believe that Mallady needed to remain at MTMHI for treatment and that outpatient treatment was a suitable alternative.

Janie Osborne, a social worker at MTMHI and part of Mallady's treatment team, had worked with Mallady on a daily basis since December 2006. She, along with the rest of the treatment team, concluded that Mallady was ready for discharge because he had been stable and never experienced a psychotic episode in the time she had been working with him. Osborne further described Mallady as "very high functioning" and able to maintain a busy daily schedule including working and attending numerous treatment groups. Mallady was a "model patient" and always followed all rules and instructions. Osborne said he had never caused any problems. Osborne described one instance in which Mallady became angry after someone took something from his room and threatened to hit the person whom he suspected. Mallady soon calmed down. Osborne considered Mallady's behavior a normal reaction. She further testified that she was "very comfortable around Mallady" and did not "think he's

dangerous at all," even considering the fact that Mallady had killed his mother. She thought that Mallady did not pose a likelihood of harm to himself or others, but that he probably would pose such a likelihood should he stop taking his medication. She testified that Mallady had abided by the rules of his furlough.

Joyce Harris, the clinical director of Safe Entry Community Health Center, testified that Mallady had been going there daily since May 3, 2010, and attending treatment sessions from 9 a.m. to approximately 1:30 p.m. Harris assisted in the development of the specific measures of Mallady's outpatient treatment, which included requirements that he receive case management services and regular appointments with psychiatrists and therapists, take his medication, submit to random drug screens, participate in daily support groups, live in an approved supervised boarding home, cooperate with the treatment team, and follow all recommendations. Harris testified that Mallady had not violated the terms of his furlough or the rules of the Safe Entry facility. She said, "[I]n fact, . . . he has been a model client or participant. He's been very helpful with other peers, . . . he's been very responsive and cooperative with staff." When questioned about the possibility that Mallady could leave the facility if he wanted to, Harris said that all the exits were supervised and that Mallady could not leave without the facility staff being aware of that fact. Additionally, any group outings away from the facility were supervised and Mallady could not leave the group without the staff knowing about it. She said that no participants at Safe Entry had ever simply "walk[ed] away."

Kevin Talley testified that he oversaw Anne's Care Home, the facility where Mallady had lived while on furlough. It was a 2200 square foot home in a residential neighborhood. Six clients lived there, and four staff members provided supervision twenty-four hours a day. The facility staff administered medicine to the clients and ensured that they took the medicine. Although the home had a kitchen, the clients did not have access to it or any potentially dangerous objects, like knives. Mallady was not permitted to leave the facility without supervision, and all the doors had alarms so that staff would know if Mallady tried to leave. If he were to leave, the staff would immediately call 911 to return him to MTMHI. Talley anticipated Mallady living at Anne's Care Home indefinitely.

Kenneth Mallady testified that he had taken Seroquel for the past five years and had not experienced any problems or negative side effects from it. He acknowledged that he would have to take the medicine for the rest of his life. He had abstained from the use of alcohol or drugs because he knew it could interfere with his medicine. Additionally, he was subject to random drug screens since he arrived at MTMHI, and he had never failed one. He saw a doctor weekly at Safe Entry while on furlough.

-4-

He explained the confrontation he had at MTMHI concerning items missing from his room. He asked the housekeeper who had been in his room whether he had seen the items. According to Mallady, the housekeeper became confrontational and threatened to hit Mallady. Mallady responded by threatening the same, and a nurse intervened, ending the situation. Mallady had contact with the housekeeper on a daily basis after that, and Mallady considered this incident an example of his ability to handle confrontation correctly.

Mallady testified that since his furlough began, he had internet access and a Facebook profile. When the State questioned Mallady as to whether this access was contrary to the goals of his treatment because it could expose him to unhealthy influences, Mallady responded that nothing in his discharge plan or other rules prohibited internet access or a Facebook profile. He additionally stated that his current doctor was aware of this fact, as was the house manager at Anne's Care.

Although Mallady asserted that he was a "free U.S. citizen," he acknowledged that he was aware of the many rules he must follow under the discharge plan and mandatory outpatient treatment contract. He recognized that he could not go anywhere without supervision because of the severity of the acts he committed. Mallady said, "I am going to be compliant with [the terms of the discharge plan and treatment contract]. I have been and intend to be."

In lieu of testimony from Mallady's family, the trial court admitted as evidence a letter from Mallady's sister expressing her opposition to placing him on outpatient treatment. In the letter, she stated that she feared for the safety of herself and her family knowing that Mallady was not in MTMHI. She stated that he was a "constant threat and danger to others," and that she feared he would "kill again or seriously harm others" if not "institutionalized at MTMHI."

Following the hearing, the court orally denied Mallady's discharge to mandatory outpatient treatment. Although the court acknowledged the testimony of the doctors that Mallady had progressed well over the four years he was in their care at MTMHI, the court found that Mallady posed a "substantial likelihood of serious harm." It stated:

> This was . . . an egregious act, and I think the Court would really be shirking its responsibilities if I didn't at least pay some heed . . . to why we're here to begin with. . . . I also think we have to pay some heed to the fact that it hadn't even been four years. . . . [F]our years is not a significant amount of time in which to recover from an illness that would cause someone to act the way he did on an occasion . . . when he killed one person and attempted to kill another.

The court then expressed concern over potential problems with Mallady's medication. It acknowledged that the medication had worked well for several years and that "there is structure [in the outpatient program] to make sure he continues to take medication." However, the court did not believe that the medication had proven to be a long-term remedy for Mallady's mental health problems. It was concerned that he could become a threat if the medication lost its effect or was not administered in proper doses. The court also stated that "there's nothing that would prohibit Mr. Mallady at this point from simply just becoming tired of the structure . . . [and] the rules" and leaving. The court concluded, "I am not able to say right now today based upon this very limited period of time, this almost four years . . ., that I think the placement recommended by your doctors are [sic] appropriate." The court allowed Mallady to remain on furlough pending the outcome of appeal.

This timely appeal followed the trial court's order.

**Analysis.** Mallady argues that the trial court erred in denying his release into the mandatory outpatient treatment program because the decision was contrary to the weight of the evidence regarding Mallady's eligibility for discharge. He asserts that the court relied on "its own subjective fear in denying [discharge] and declined to accept the opinion of two psychiatrists and a social worker at MTMHI." The State responds that the record supports the trial court's decision that Mallady "was not an appropriate candidate for mandatory outpatient treatment." We agree with Mallady.

The United States Supreme Court has explained that "[t]he Due Process Clause 'requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.'" Jones v. U.S., 463 U.S. 354, 368 (1983) (quoting Jackson v. Indiana, 406 U.S. 715, 738 (1972)). Because the purpose of commitment following a verdict of not guilty by reason of insanity is to protect both the person and society from danger, the person is "entitled to release when he has recovered his sanity or is no longer dangerous." Id.

In furtherance of these principles, Tennessee Code Annotated section 33-6-602 provides that a person who has been committed after a judgment of not guilty by reason of insanity is eligible for discharge to mandatory outpatient treatment when the hospital staff concludes that (1) the person has a mental illness in remission, (2) the person's mental illness "is likely to deteriorate rapidly to the point that the person will pose a likelihood of serious harm under § 36-6-501 unless treatment is continued," (3) the person is likely to participate in outpatient treatment if legally obligated to do so but unlikely to participate if not legally obligated, and (4) "mandatory outpatient treatment is a suitable, less drastic alternative to commitment." T.C.A. § 33-6-602 (2006). For the purposes of this inquiry, a person poses a likelihood of serious harm "if and only if" either (1) the person has threatened or attempted

suicide or the infliction of serious bodily harm on himself, (2) the person has threatened or attempted homicide or other violence, (3) the person has placed others in reasonable fear of violence and serious physical harm, or (4) the person is unable to avoid severe impairment or injury from specific risks. Id. § 33-6-501(1). In addition, there must also be a "substantial likelihood that the harm will occur unless the person is placed under involuntary treatment." Id. § 33-6-501(2).

The chief hospital officer's determination that a person is eligible for discharge under section 33-6-602 creates a presumption that can be rebutted only with "clear, unequivocal, and convincing evidence."[1] Id. § 33-6-708(c)(1), (4). This court reviews the trial court's decision regarding discharge to mandatory outpatient treatment de novo with a presumption of correctness, unless the evidence preponderates otherwise. State v. Groves, 735 S.W.2d 843, 844 (Tenn. Crim. App. 1987).

Here, the trial court denied Mallady's discharge to mandatory outpatient treatment. It first found that Mallady posed a substantial likelihood of serious harm based on a concern that he could become violent if his medication lost its efficacy or was improperly administered. Although the relevance of the court's finding that Mallady presently posed a likelihood of serious harm is not immediately apparent from the statute governing discharge to mandatory outpatient treatment,[2] we interpret this as a finding that mandatory outpatient treatment is not a suitable alternative to involuntary commitment. See T.C.A. § 33-6-602(1)(E); see also id. § 33-6-502 (providing for consideration of whether the person poses a "substantial likelihood of serious harm" in initial authorization of involuntary commitment). The court also implicitly found that Mallady was unlikely to participate in the mandatory outpatient treatment program because it lacked sufficient measures to prevent him from abandoning the program.

The weight of the evidence preponderates against the trial court's findings. In finding that Mallady posed a likelihood of serious harm and the treatment program was unsuitable as a result, the court relied on Dr. Jahan's testimony that there was a ten to fifteen percent

_____

[1]This court has explained that the word "unequivocal" is not to be taken literally in this context because such a degree of certainty is unobtainable where, as here, the evidence and opinions are based on only "reasonable medical certainty." State v. Groves, 735 S.W.2d 843, 846 (Tenn. Crim. App. 1987) (citing Addington v. Texas, 441 U.S. 418, 430-32 (1979)). The word "merely raises the level of the clear and convincing standard." Id.

[2]Such a finding is clearly relevant when considering discharge to voluntary outpatient treatment. T. C. A. § 33-6-706(2)(B)(ii). Although Mallady also cites this statute in his brief before this court, it does not apply when considering discharge to mandatory outpatient treatment, an inquiry which is governed by section 33-6-602.

-7-

chance that patients like Mallady would relapse despite proper medication and treatment. Additionally, the letter from Mallady's sister expressing a fear, based on Mallady's killing of his mother, that he would return to violence arguably tended to support a finding that Mallady was dangerous. This evidence, however, does not outweigh the testimony of the several witnesses at the hearing who had firsthand experience with Mallady and were familiar with his behavior since he began treatment. These witnesses all testified that Mallady was not dangerous and had not been dangerous for several years. Although they acknowledged that Mallady could become dangerous should his medication stop working, the evidence showed that the outpatient treatment program included safeguards to identify the early stages of a relapse and to prevent danger. The evidence, therefore, preponderates against the trial court's finding that Mallady posed a likelihood of harm.

The weight of the evidence also preponderates against the court's finding that Mallady would not participate in the outpatient treatment program. Every witness testified to Mallady's unfailing compliance with his treatment program. He was described as "a model patient," both while in MTMHI and on furlough. None of his treatment providers ever had any kind of problem from him. Furthermore, witnesses testified that Mallady was under constant supervision while on furlough, and he would be unable to leave the treatment facilities without staff being aware of that fact. The trial court's finding is unsupported by the evidence at the hearing.

Finding that the evidence preponderates against the trial court's findings, we review the issue of mandatory outpatient treatment de novo, without a presumption of correctness. See T. R. A. P. 13(d); State v. Tripp, 754 S.W.2d 92, 94 (Tenn. Crim. App.1988) (reviewing the trial court's denial of release from judicial commitment into mandatory outpatient treatment). We conclude that Mallady is entitled to discharge under the terms of the mandatory outpatient treatment program. The State did not provide "clear, unequivocal, and convincing evidence" to rebut the presumption, created by the chief hospital officer's determination, that Mallady should be discharged to mandatory outpatient treatment. In fact, the only evidence that the State offered in support of its position was the letter written by Mallady's sister. While the letter expressed an undoubtedly genuine fear based on Mallady's acts before he underwent treatment for his mental illness, it did not provide any evidence that Mallady still posed a threat after successfully completing four years of treatment. As a result, the letter does not constitute sufficient evidence to rebut the presumption that Mallady should be discharged. Additionally, the trial court's reliance on the testimony that there was a ten to fifteen percent chance that Mallady could relapse despite appropriate treatment was misplaced. This evidence does not demonstrate a "substantial likelihood that . . . harm will occur unless the person is placed under involuntary treatment," which is required to authorize involuntary commitment. T.C.A. § 33-6-501(2); id. § 33-6-502(2). Such a statistically low possibility of relapse, which had not occurred in the four years since Mallady began taking

the medication, is not sufficient to prove a "substantial likelihood." As a result, this evidence also does not constitute clear, unequivocal, and convincing evidence to rebut the determination that Mallady should be discharged.

Rather, the evidence supports MTMHI's determination that Mallady is suitable for mandatory outpatient treatment under section 33-6-602. First, Mallady's condition was in remission. See T.C.A. § 33-6-602(1)(A). His doctors testified that although he experienced psychotic episodes before he began taking his current medication, he had not had a relapse in almost four years and his illness was in remission. Second, without treatment his condition could deteriorate such that he poses a likelihood of serious harm if untreated. See id. § 33-6-602(1)(B). Dr. Jahan, Dr. Gaboy, and Osborne testified that he could relapse and become violent if he stopped taking medication or if it lost its effect. Third, Mallady is likely to participate in outpatient treatment, certainly with a legal obligation to do so and arguably even without such a legal obligation. Id. § 33-6-602(1)(C), (D). All the witnesses testified to Mallady's strict compliance with the program. Finally, mandatory outpatient treatment is a suitable alternative to commitment. Id. § 33-6-602(1)(E). There was no proof at the hearing that Mallady's situation required inpatient treatment, either to protect him and others from danger or to effectively treat Mallady. The program Mallady's treatment team developed for him provides continued treatment while at the same time maintaining supervision and other cautionary measures to protect from danger. The suitability of the program for Mallady, and Mallady's suitability for it, are further demonstrated by his success and compliance during the four months that passed between his furlough and the evidentiary hearing before the trial court. As a result, Mallady should be discharged to mandatory outpatient treatment.

We recognize the trial court's concern for public safety in its hesitation to discharge Mallady to outpatient treatment. Nevertheless, the statutory scheme reflects the considered judgment of the state legislature as to the proper balance between the need to protect the public from the person while at the same time protecting the person from unjustified detention. State v. Janice Floyd, No. W2000-02236-CCA-R3-CD, 2001 WL 846046, at *5 (Tenn. Crim. App., at Jackson, July 20, 2001).

## CONCLUSION

Upon review, we reverse the judgment of the trial court. We remand the case for entry of an order, pursuant to Tennessee Code Annotated section 33-6-708(c)(4), discharging Mallady from involuntary commitment under the terms of the mandatory outpatient treatment program recommended by the chief officer.

_____
CAMILLE R. McMULLEN, JUDGE