IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 20, 2003 Session

## STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES v. R.A.W.

**Appeal from the Juvenile Court for Greene County**
**No. 15766     Thomas J. Wright, Judge**

FILED NOVEMBER 25, 2003

**No. E2003-00847-COA-R3-PT**

R.A.W. ("Father") challenges the termination of his parental rights, claiming there was insufficient proof to establish grounds for termination or that it was in the best interest of the child to terminate the parent-child relationship. Father also claims the Juvenile Court erred when it refused to grant him visitation after the petition to terminate his parental rights had been filed. We affirm the decision of the Juvenile Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the**
**Juvenile Court Affirmed; Case Remanded.**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

Douglas L. Payne, Greeneville, Tennessee, for the Appellant R.A.W.

Paul G. Summers, Attorney General and Reporter, and Dianne Stamey Dycus, Deputy Attorney General, Nashville, Tennessee, for the Appellee State of Tennessee, Department of Children's Services.

# OPINION

## Background

Father appeals the termination of his parental rights to his now six year old son, T.A.W. ("the Child"), by the Greene County Juvenile Court. When the Child originally came into custody of the Department of Children's Services ("DCS"), he was living with his mother's aunt and uncle, Mr. and Mrs. Nance, his two year old half-sister, and his eight month old half-brother. In October of 2001, DCS was informed that the children were at a flea market with Mr. and Mrs. Nance and that they were not dressed appropriately for cold weather. The youngest child was examined by EMS personnel and was found to be cold and unresponsive. The Child also was cold and stated he was afraid of Mr. Nance who had hurt his arm. There were bruises on the Child's arm and the back of his neck. All three children had active head lice. Witnesses stated Mr. Nance had picked up the Child and thrown him into a van, stating he was going to "beat the hell out of him" and "would beat his ass." Mr. and Mrs. Nance were arrested and charged in relation to these events. The Petition for Temporary Custody indicates Father's whereabouts were "currently unknown."

The petition seeking to terminate Father's parental rights alleged Father had willfully failed to visit or to engage in more than token visitation with the Child for a period of four consecutive months preceding the filing of the petition. It also was alleged that Father had willfully abandoned the Child by not paying any child support for a period of four consecutive months. DCS asserted it had made reasonable efforts to assist Father in establishing a suitable home for the Child, but he had not made a reasonable effort to accomplish this objective. DCS claimed Father demonstrated such a lack of concern that it appeared unlikely he would be able to provide a suitable home for the Child. The Petition also alleged that the conditions preventing Father from providing a suitable home for the Child still remained and had persisted for a period of six months. According to the Petition, continuing the parent-child relationship would greatly diminish the Child's chances of early integration into a stable and permanent home. Finally, DCS maintained that termination of the parent-child relationship was in the best interests of the Child.[1]

The Permanency Plan ("the Plan") developed for Father contained numerous items which he needed to complete. These included: (1) completing a psychological assessment which included a parenting capability assessment; (2) attending and successfully completing a parenting class; (3) paying child support; (4) remaining drug free and submitting to random drug screens; (5) providing appropriate and safe housing for the Child independent of Father's parents "due to disclosures of previous abuse" by Father's father; (6) maintaining adequate transportation in the event of an emergency; (7) attending counseling for past/current behavioral issues; and (8) maintaining stable employment. The Plan was approved by DCS in July of 2002 and by the Juvenile

---

[1] DCS also filed a petition to terminate the parental right of the mother with regard to all three of her children. The mother did not contest the petition and has not appealed the Juvenile Court's judgment which terminated her parental rights.

Court in October. Father apparently refused to sign the Plan because he wanted to discuss the Plan with an attorney.

In July of 2002, Father filed a motion seeking to establish visitation with the Child. On October 23, 2002, a hearing was held on this motion at which time the Juvenile Court received evidence and heard testimony. After this hearing, the Juvenile Court entered an Order and deferred granting Father visitation until Father "has participated significantly in intensive individual counseling." The record on appeal contains neither a transcript or statement of the evidence of this hearing.

A trial was conducted on January 15th and March 12th of 2003.[2] The first witness was Father's sister, Toni Malone ("Malone"). Malone testified Father has problems with conflict and dealing with "reality issues." When something happens that Father does not like, he has trouble "figuring out what to do with that and how to ventilate … that anger." Ms. Malone did not believe Father was capable of taking care of himself, "let alone anybody else." However, Ms. Malone also believed Father had the potential to change.

Bill Cook ("Cook"), a Licensed Senior Psychological Examiner, testified that he began treating Father in June of 2001. Father started therapy with Cook after Father was released from Lakeshore Mental Health Institute ("Lakeshore"). The records from Lakeshore indicate Father had been in his car for three days and refused to get out even to eat, and also that Father made a bomb threat against his employer. Father denied making a bomb threat and claimed he was framed. Father apparently told a crisis worker that he heard voices over the PA system at work talking to him, but Father later denied making such a statement. Cook saw Father on two occasions and then did not see him again until custody of the Child became an issue. Cook expressed concern over Father's denial of his mental health history. Cook also talked with Father about an incident where Father allegedly assaulted a ten year old girl. Father claimed he was getting out of a booth at a Waffle House when his foot "tapped" the girl. Cook asked Father about the fact that the young girl had a bruise of some size, to which Father stated that maybe someone else had hit the child.[3]

According to Cook, Father thinks in terms of "black and white and wrong and right." Father could give a "pat answer" when there was a clear right or wrong answer, but "if it required abstracting he had … a lot of difficulty with that." Father explained to Cook that he had graduated from anger control management classes and if he became angry while with the Child, he would count to ten or go walk off the anger. If provoked to anger, Father stated that he would "lose it" if he did not count to ten or go for a walk. Cook had asked Father to schedule appointments for every two weeks, but Father scheduled appointments only for once a month. Father completed approximately

---

[2] In July of 2002, Father's parents filed a motion to intervene and a petition for custody of the Child. This petition was the primary focus of the hearing in January of 2003. Father's parents eventually dismissed their petition. We will not discuss testimony or evidence at the January hearing to the extent such evidence pertains only to the abandoned petition for custody.

[3] Father made these denials notwithstanding the fact that he had already pled guilty to assaulting the girl.

five therapy sessions with Cook since October. Father had an appointment with Cook scheduled the morning of the January hearing. Father was late and when he showed up, he informed Cook he was no longer employed. According to Father, he was unable to obtain his work schedule. He missed one day of work and was fired. Cook stated Father would have "a lot of difficulty" raising the Child. However, Father had improved and was trying. Cook saw no reason why Father could not visit with the Child, although Cook recommended any initial visits be supervised. Cook did not believe Father was dangerous or that he posed a threat to the Child or others, "unless he were to go off his medication or he was to be provoked into some sort of anger." Cook testified that Father has been diagnosed with mood disorder, not otherwise specified, and personality disorder, not otherwise specified. According to Cook, the personality disorder comes from years of learning and experience and "[u]ndoing the personality disorder is very difficult and it takes time, lots of time sometimes." Cook acknowledged Father's telling him that establishing a residence and obtaining transportation might be insurmountable for him.

At the end of the hearing in January of 2003, the Juvenile Court continued the matter until March. One of the reasons for the continuance was to give Father more time to comply with the terms of the Plan. When the hearing resumed in March, Cook testified that Father had made no further progress with regard to controlling his emotions and no progress on his parenting skills. According to Cook, whenever Father's emotions become involved, he is "unable basically … to function. He loses the ability to be rational." Cook believed Father would have difficulty forming a plan or doing what was necessary if parenting a six year old child. When asked if Father had the ability to take proper care of the Child, Cook responded Father "would have a lot of difficulty, if he could at all …." Cook testified that if Father quit taking his medications, and depending on his level of stress, Father would begin to regress, become more depressed and have mood swings, and "possibly hear voices, possibly get back in the situation where he was not bathing and staying in the car." If that were to happen, Father could pose a danger to himself or others.

Father testified at the initial hearing in January that he was living with his parents. Father had completed a parenting class and he explained how that class helped him interact with his niece and be more tolerant toward her. Father was current on child support payments. According to Father, he had been recently discharged from his job at a grocery store after he unsuccessfully attempted to obtain his work schedule, but no one at work would answer the phone. When he missed one day of work, he was discharged. Father had a vehicle but it was not driveable because the engine had caught on fire. Father claimed he was taking his medication in the prescribed doses. Father believed it would be best for the Child if Father's parents had custody at first because Father could not financially support the Child. Father stated he would like for his parents to have custody until he could get back on his feet. If his parents had custody, he would assist them in caring for the Child. Father testified to an incident where his father had been drinking too much and pulled a gun on Father and his mother. His father was arrested for aggravated assault and pled guilty to simple assault. Father admitted the last time he saw the Child was in April of 2001.

Father testified further when the hearing was concluded in March. By that time, Father was staying with a friend and sleeping on a couch. Father had remained unemployed since

January and was now behind on child support payments. Father testified he was attempting to find employment. Father still has no reliable transportation. Father's driver's license was revoked after he received a speeding ticket and failed to show proof of insurance. Father had quit taking his medication for approximately one month due to lack of funds. Father has noticed a "slight" change in his emotional state, but "nothing major." Father admitted that he has visited the Child only ten times since the Child was six months old.

The Child's biological mother, K.H. was called as a witness. K.H. acknowledged that the Juvenile Court already had terminated her parental rights to the Child. K.H. stated that for a period of time, Father questioned whether he was the biological father of the Child. K.H. testified that Father has seen the Child approximately three times since she and Father quit seeing each other approximately five months after the Child was born. She also claimed Father did not spend much time at all with the Child for the first five months after he was born.

The next witness was Lana Justis ("Justis"), the DCS caseworker assigned to this case. Justis identified the Plan and stated she discussed its requirements with Father, but Father refused to sign the Plan. The Plan required Father to complete a psychological assessment and a parenting class, both of which he did accomplish. Justis testified Father was current on his child support payments until he lost his job in January of 2003. The Plan also required Father to secure appropriate housing for the Child independent of his parents. The reason for this was the assault conviction against Father's father and Father's claim that his father had abused him as a child. Justis testified that to her knowledge, Father still was living with his parents. The Plan also required Father to obtain suitable transportation. Justis stated Father's vehicle was not operational due to a fire. Justis further testified that to her knowledge, Father remained unemployed.

Father called Michael Vitale, Sr. ("Vitale") as a witness. Vitale testified he drove Father to visit the Child on the Child's fourth birthday. Vitale testified to the positive interaction he observed between Father and the Child. Father was living with Vitale and Vitale's fiancee at the time of this hearing. Father was sleeping on Vitale's couch.

After the proof was completed, the Juvenile Court concluded the State failed to prove by clear and convincing evidence that Father had abandoned the Child because of his willful failure to pay child support. However, the Juvenile Court found the State had proven by clear and convincing evidence that Father abandoned the Child by willfully failing to visit the Child for a period of four consecutive months preceding the filing of the petition. The Juvenile Court observed that after the Child had reached the age of six months, for the next four year period, Father only visited the Child from three to ten times, depending on whose testimony was credited. After the Child was placed in State custody, Father did not visit or attempt to visit the Child until after the petition to terminate his parental rights was filed in June of 2002.

The Juvenile Court also concluded the State made a reasonable effort to assist Father with establishing a suitable home for the Child. Father, however, had made no reasonable effort to provide a suitable home for the Child and demonstrated a lack of concern to such a degree that it

appeared unlikely he would be able to provide a suitable home at an early date. According to the Juvenile Court, Father, who at that point was sleeping on a friend's couch, did not have a suitable home for the Child. Father made little to no progress with regard to his parenting skills or his anger management. Father had no transportation or a valid driver's license, and was unemployed. In short, Father was unable to provide for the Child. The Juvenile Court then concluded the State had proven by clear and convincing evidence that these "other conditions" which, in all reasonable probability would cause the Child to be subjected to further abuse or neglect, continued to persist and prevented awarding custody to Father. The Juvenile Court determined there was little likelihood that these conditions would be remedied at an early date.

The Juvenile Court stated that between the January and March hearings, Father had "gone backwards because now he doesn't even have a room or a car or a driver's license or a job. He's not taking his medication admittedly and has had some regression in his emotional control." Based on these facts, the Juvenile Court concluded that continuation of the parent-child relationship would diminish the Child's chances of an early integration into a safe and stable home. The Juvenile Court then thoroughly reviewed each of the statutory factors relevant to whether it was in the Child's best interests to terminate the parent-child relationship. After so doing, the Juvenile Court concluded the evidence was clear and convincing that it was in the best interests of the child to terminate the parent-child relationship.

Father appeals, claiming he did not have "an adequate opportunity to complete his permanency plan" and, therefore, the Juvenile Court erred when it terminated his parental rights. Alternatively, Father argues that he had sufficiently complied with the terms of the Plan and his parental rights should not have been terminated. According to Father, the State did not prove by clear and convincing evidence either that grounds for termination existed or that it was in the best interest of the child to terminate the parent-child relationship. Father also claims the Juvenile Court erred when it prohibited him from visiting with the Child.

## Discussion

The factual findings of the Juvenile Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

In *State v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*, this Court discussed the relevant burden of proof in cases involving termination of parental rights. Specifically, we observed:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776

S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson,* 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.,* 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c). This Court discussed the "clear and convincing evidence" standard in *O'Daniel v. Messier,* 905 S.W.2d 182 (Tenn. Ct. App. 1995), as follows:

> The "clear and convincing evidence" standard defies precise definition. *Majors v. Smith,* 776 S.W.2d 538, 540 (Tenn. Ct. App. 1989). While it is more exacting than the preponderance of the evidence standard, *Santosky v. Kramer,* 455 U.S. at 766, 102 S. Ct. at 1401; *Rentenbach Eng'g Co. v. General Realty Ltd.,* 707 S.W.2d 524, 527 (Tenn. Ct. App. 1985), it does not require such certainty as the beyond a reasonable doubt standard. *Brandon v. Wright,* 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992); *State v. Groves,* 735 S.W.2d 843, 846 (Tenn. Crim. App. 1987).
>
> Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *See Hodges v. S. C. Toof & Co.,* 833 S.W.2d 896, 901 n. 3 (Tenn. 1992). It should produce in the fact-finder's mind a firm belief or conviction

with regard to the truth of the allegations sought to be established. *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn. Ct. App. 1993); *Brandon v. Wright,* 838 S.W.2d at 536; *Wiltcher v. Bradley,* 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985).…

*State v. D.G.S.L.*, 2001 Tenn. App. LEXIS 941 at **16-18 (Tenn. Ct. App. Dec. 28, 2001).

Termination of parental rights may be based upon a number of statutory grounds. In the present case, the two grounds upon which the Juvenile Court based its ruling are:

(1)     Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; [and]

* * * *

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i)     The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii)     The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. §§ 36-1-113(g)(1) and (g)(3) (Supp. 2003).

The Juvenile Court found there was clear and convincing evidence that both of these statutory grounds for termination of Father's parental rights had been met. In making this determination, the Juvenile Court heard the testimony of numerous witnesses, including Father, Justis, and Cook. "Unlike this Court, the [Juvenile Court] observed the manner and demeanor of

-8-

the witnesses and was in the best position to evaluate their credibility." *Union Planters Nat'l Bank v. Island Mgmt. Auth., Inc.*, 43 S.W.3d 498, 502 (Tenn. Ct. App. 2000). The trial court's determinations regarding credibility are accorded considerable deference by this Court. *Id.*; *Davis v. Liberty Mutual Ins. Co.*, 38 S.W.3d 560, 563 (Tenn. 2001). "'[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary.'" *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

Based on our review of the record, including the facts detailed above, we do not believe the Juvenile Court committed any reversible error in reaching its conclusion that clear and convincing evidence existed to terminate Father's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3)(A)(i) through (iii). There is clear and convincing evidence that "other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of … [Father] still persist." Tenn. Code Ann. § 36-1-113(g)(3)(A)(i). Specifically, Father is not and apparently never has had a suitable home for the Child. At the time of the final hearing in March, Father was sleeping on a friend's couch. Father has not had suitable transportation for some time. Father was unemployed and had no source of income with which to raise a young child. Equally important is the fact that Father had stopped taking his medication and his emotional capacity was beginning to regress. There was absolutely no proof offered at trial that any of these conditions would be remedied in the near future, or if ever. Father had approximately eight months after the Plan's requirements were explained to him to substantially comply with those requirements. During that eight month period, not only has Father made no reasonable effort to undertake what was necessary in order for him to be able to properly support the Child, but he has gone "backwards." We believe Father had sufficient time to establish that he could or would make progress to the point where he would be able to care for the Child, and he made no such showing. We likewise agree with the Juvenile Court that the evidence is clear and convincing that continuation of the parent-child relationship would greatly diminish the Child's chances of early integration into a safe, stable and permanent home.

Having affirmed that at least one statutory ground for termination was proven by clear and convincing evidence, we next address Father's claim that it was not proven by clear and convincing evidence that termination of his parental rights was in the best interests of the Child. Tenn. Code Ann. § 36-1-113(i) describes the standard for determining whether termination is in the best interests of the child in such cases:

> (I)    In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1)    Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2003). After considering all relevant statutory factors in light of the testimony of the witnesses at trial, we do not believe the Juvenile Court committed reversible error when it concluded that clear and convincing evidence established that it was in the best interest of the Child to terminate Father's parental rights.

Because we affirm the termination of Father's parental rights pursuant to Tenn. Code Ann. §§ 36-1-113(g)(3)(A)(i) through (iii), we need not decide whether there was clear and convincing evidence that Father abandoned the Child by willfully failing to visit him for a period of four consecutive months immediately preceding the filing of the petition. Due to our resolution of the preceding issues, all remaining issues are pretermitted as they would not affect the outcome of this appeal.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for such further proceedings as may be required, if any, consistent with this Opinion, and for collection of the costs below. The costs on appeal are assessed against the Appellant R.A.W. and his surety.

_____
D. MICHAEL SWINEY, JUDGE