# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 26, 2016 Session

## STATE OF TENNESSEE v. DAVID CLOAR

**Appeal from the Criminal Court for Hamblen County**
**No. 90CR284     Thomas Wright, Judge**

---

**No. E2015-01069-CCA-R3-CO – Filed July 27, 2016**

---

Following a jury trial in 1992, the Defendant, David Cloar, was found not guilty by reason of insanity on two counts of first degree murder. The Defendant was then involuntarily committed to the Middle Tennessee Mental Health Institute pursuant to Tennessee Code Annotated section 33-7-303(c). The Defendant now appeals from the trial court's order denying his discharge, following a ninety-day furlough to a residential group home, from involuntary commitment. The Defendant contends that it was not established by clear, unequivocal, and convincing evidence that he was ineligible for discharge under the applicable statute. Following our review, we reverse the judgment of the trial court and remand this case for the entry of an order discharging the Defendant pursuant to the discharge plan submitted by the Middle Tennessee Mental Health Institute.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

John E. Eldridge, Knoxville, Tennessee, for the appellant, David Cloar.

Nathan Henry Mauer, Nashville, Tennessee, for the Tennessee Department of Mental Health and Substance Abuse Services.

Herbert H. Slatery III, Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Dan E. Armstrong, District Attorney General; and Connie Trobaugh, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

FACTUAL BACKGROUND

*I. Procedural Background*

On December 11, 2014, the chief executive officer of the Middle Tennessee Mental Health Institute ("the Institute") filed a notice in the trial court pursuant to Tennessee Code Annotated section 33-6-708 stating the Institute's intent to discharge the Defendant from his involuntary commitment. The notice stated the chief executive officer's conclusion that the Defendant was eligible for discharge. Attached to the notice was a "furlough/discharge plan" for the Defendant which stated that the Institute intended to furlough the Defendant to a residential group home for ninety days before discharging him. On December 18, 2014, the trial court, on its own motion, ordered an evidentiary hearing on this matter. On April 15, 2015, the Institute filed an amended "furlough/discharge plan" for the Defendant, changing only the residential group home that he would be furloughed to. The evidentiary hearing was held on April 23, 2015.

*II. The Underlying Offenses*

Edward R. Sempkowski, who assisted in the Defendant's prosecution, testified at the hearing about the murders. Mr. Sempkowski testified that he had not looked at the Defendant's file in over twenty years and that he had only briefly reviewed the Defendant's statements and the autopsy reports prior to the hearing. Mr. Sempkowski recalled that in July 1990, the Defendant "heard the voice of Jesus [Christ] telling him that he [had] work for him to do." The Defendant then drove from his home in Knoxville to the home of his father and stepmother in Morristown. When his father answered the door, the Defendant told him, "Jesus loves you," and "proceeded to stab his father multiple times." After stabbing his father and getting a second knife from the kitchen, the Defendant chased down his stepmother as "she was running across the yard to a neighbor's house to get some assistance" and "cut her throat."

Mr. Sempkowski recalled that the wound to the Defendant's stepmother's throat was so severe it "almost decapitated her." Mr. Sempkowski also recalled that the Defendant inflicted a wound to his father's chest so severe that it exposed his heart. The Defendant stated to the police that after he cut his stepmother's throat, Jesus Christ spoke to him again and told him that he needed "to make sure the job [was] finished." The Defendant rolled his stepmother's body over and stabbed her "multiple times in the anterior chest area." The Defendant left the knife inside his stepmother's body "sunk to the hilt." The Defendant then took off his shoes and sat down underneath a tree to wait for the police. The Defendant "almost immediately" told the responding officers "that he had been told by Jesus [Christ] to kill" the victims. Mr. Sempkowski further recalled that the Defendant was not deemed competent to stand trial until almost two years after the murders.

-2-

### III. Mental Health Professionals

### A. Attending Psychiatrist

Doctor David Scott Crawford, an attending psychiatrist at the Institute, was determined by the trial court to be an expert in general and forensic psychiatry. Dr. Crawford testified that he treated the Defendant for approximately nine months prior to being transferred to a different unit of the Institute. During his treatment of the Defendant, Dr. Crawford recommended that the Defendant be discharged from the Institute. Dr. Crawford related to the trial court his understanding of the Defendant's crimes. Dr. Crawford testified that it was his understanding that, at the time of the offenses, the Defendant was "having delusions that his father was Satan and [that] something bad would happen if he didn't put a stop to it, [and] that his stepmother might [have been] possessed." The Defendant was also "having some hallucinations . . . [that] he was getting messages or instructions from God."

### 1. The Defendant's Treatment History

Dr. Crawford testified that the Defendant was initially diagnosed with "schizophrenia, paranoid and chronic," and was treated with five milligrams per day of Stelazine. Dr. Crawford further testified that it was his understanding that the Defendant's symptoms remitted "shortly" after he was placed on Stelazine. Approximately a year after the Defendant was diagnosed with schizophrenia, a different psychiatrist diagnosed the Defendant with "brief reactive psychosis, alcohol dependent, and persistent personality disorder[,] non-specific." Dr. Crawford testified that at some point, the Defendant was taken off of Stelazine. After being taken off the Stelazine, the Defendant "described . . . [that] he was becoming a little bit more religiously preoccupied" and "brought that to the attention of the staff." Dr. Crawford testified that "people were concerned that [the Defendant] might [have been] in the early stages of decomposing," so he was placed back on Stelazine and had not been taken off medication since then. Dr. Crawford further testified that there was "no documentation of [the Defendant's suffering] any clear hallucinations or delusions . . . during that time off medications."

Dr. Crawford acknowledged that in 1995, a third psychiatrist opined that "without medication and certainly with resumption of drinking," the Defendant "would be at considerable risk for the prompt and perhaps even explosive return to psychosis" and that the Defendant's discharge "should be approached slowly and carefully and in deliberate stages or steps." Dr. Crawford testified that he was aware that this was not the first attempt to discharge the Defendant, that the Institute had attempted to discharge the Defendant in 1995, 1997, and 2001, that all of these other attempts were ultimately withdrawn, and that some of the other attempts might have included mandatory

outpatient treatment for the Defendant. Dr. Crawford also testified that in 2003, the Defendant scored as a medium risk to violently reoffend using the "Violence Risk Appraisal Guide." However, Dr. Crawford explained that the test was focused on a patient's "past history" and would not necessarily reflect "whether the patient's clinical condition [had] improved." Dr. Crawford was also aware that the Defendant had not had a "urine drug screen" since 2009 but testified that the Defendant did not "have a history of drug abuse."

### 2. The Defendant's Current Diagnosis and Treatment

Dr. Crawford testified that the Defendant was currently diagnosed as suffering from "delusional disorder, grandiose type, in remission." Dr. Crawford explained that schizophrenia "would involve more prominent hallucinations and delusions together for a longer period of time" than what the Defendant had suffered. Dr. Crawford also explained that with delusional disorder "the course is often a little better than with schizophrenia, that people may get better and stay better longer." Dr. Crawford opined that this was consistent with the fact that the Defendant "seemed to be functioning very well [and] not deteriorating over the years as schizophrenics often do." Dr. Crawford noted that "alcohol withdrawal" may have caused "some of the [Defendant's] initial symptoms."

Dr. Crawford testified that the Defendant was currently being treated with five milligrams per day of the anti-psychotic medication Prolexin. Dr. Crawford characterized the Defendant's dosage as "on the low side." Dr. Crawford further testified that the Defendant was also taking Cogentin "to help prevent some side effects that the Prolexin might cause." In discussing the Defendant's remission, Dr. Crawford testified that he was "not sure" if the Defendant was in remission "only because [he was] on medication." Dr. Crawford explained that with delusional disorder "some people may have a chronic persistent illness," but that others "may just have an episode of psychotic symptoms and then go in remission and do fine," while still others "may go into remission without treatment, and then maybe the symptoms might recur again." Dr. Crawford opined that it was "not certain that [the Defendant was] only in remission from the medication but it certainly [would] improve the likelihood that [his disease would] stay in remission if he stay[ed] on the medications." Dr. Crawford testified that the Institute had "chosen to continue some medications just as a preventative measure."

### 3. Discharge Recommendation

Dr. Crawford opined that the Defendant no longer met the criteria for continued hospitalization and was eligible for discharge. Dr. Crawford explained that the Defendant had not "demonstrated any active psychiatric symptoms" for "probably ten years or more" and that the Defendant was "the highest functioning patient in terms of his

level of privileges" at the Institute. Dr. Crawford continued, testifying that the Defendant did not "have any active psychotic symptoms" such as hallucinations or delusions and that the Defendant did not demonstrate any "thoughts of hurting himself or anybody else." Dr. Crawford testified that the Defendant was "calm in his interactions with other people," that he had "demonstrated a willingness to continue to take his medication," and that the Defendant realized that "he needs to stay on" his medication to "decrease any chances that he might relapse." Dr. Crawford characterized the Defendant as "fully cooperative and willing to continue to stay on his treatments both in the hospital and after he leaves."

Dr. Crawford opined that the Defendant would not be a danger to himself or others if he was discharged. Dr. Crawford further testified that he did not believe that the Defendant would stop his treatment or taking his medication if he was discharged. Dr. Crawford explained that he based this on the fact that the Defendant did not have any issues with compliance in his treatment or taking his medications during the twenty-three years he had been committed to the Institute. Dr. Crawford testified that he believed the Defendant could independently "maintain his stability and current compliance" because the Defendant was "one of the highest functioning patients" at the Institute. Dr. Crawford further testified that he believed that the Defendant was "motivated and willing to continue to go to his doctor's appointments and [to] take his medications." Dr. Crawford characterized the Defendant's chances of success upon discharge as "very good" if the Defendant continued to take his medication.

Dr. Crawford continued, testifying that he had "[n]umerous discussions" with the Defendant about the Defendant's continuing to take his medication after being discharged from the Institute. Dr. Crawford believed that the Defendant understood his illness and that "he need[ed] to take medications and stay off of drugs and alcohol." With respect to the Defendant's medication, Dr. Crawford explained that the Defendant did not have to take his medication at the Institute. Instead, "the nurses offer[ed] [the Defendant] the medicines and he . . . just ha[d] to agree to take it." Dr. Crawford further explained that the Defendant could refuse to take his medication and that the Institute would not force him to take it unless he was "an acute risk of hurting somebody." However, the Defendant had never refused to take his medication during his twenty-three years at the Institute.

Dr. Crawford also discussed the Defendant's privileges at the Institute. Dr. Crawford testified that the Defendant had "unsupervised privileges" there. Dr. Crawford explained that the Defendant could hypothetically walk out and abscond from the Institute if he chose to do so or "have a friend meet him [in the parking lot] with a . . . beer." However, the Defendant had remained compliant with his treatment and the Institute's rules. Dr. Crawford further testified that the Defendant was one of few

patients at the Institute allowed to go off-site. Dr. Crawford explained that the Defendant was transported by staff four days a week to Park Center, "a mental health rehabilitation" center, where the Defendant received "job training," "classes on alcohol and drug rehabilitation," "social skills training," and "mental health counseling."

Dr. Crawford testified that he did not think the Defendant was "at considerable risk" for relapse given his "lack of symptoms" for several years. Dr. Crawford further testified that he thought the Defendant's "prognosis [was] much better than they might've thought" earlier in his treatment. Dr. Crawford admitted that there was no guarantee that the Defendant would continue taking his medication if he were discharged. However, Dr. Crawford was reassured by the Defendant's history of compliance and the fact that the Defendant had demonstrated a "willingness . . . to ask for help" when he was previously taken off of his Stelazine and "started becoming more religiously preoccupied." Dr. Crawford opined that the Defendant did not present a substantial risk of harm to himself or others at the time of the hearing. Dr. Crawford also testified that at no point in his treatment of the Defendant did he think that the Defendant met the statutory criteria for involuntary commitment. Dr. Crawford characterized the Defendant as having an "excellent" "motivation to succeed in the outside world." Dr. Crawford also noted that he had treated patients with worse symptoms than what the Defendant was currently experiencing in an outpatient setting and that he believed the Defendant could successfully be treated on an outpatient basis.

### 4. Discharge Plan

Dr. Crawford also discussed the details of the discharge plan for the Defendant. Dr. Crawford testified that the Defendant would be furloughed to a residential group home for ninety days "just to make sure things work[ed] out on a trial basis." During that time period, the Defendant could be sent back to the Institute if there were "any problems." Dr. Crawford explained that a typical furlough is for thirty days but that the Defendant's was "more extended since [he had] been in the hospital for a while." Dr. Crawford further explained that the group home was staffed twenty-four hours a day and would dispense the Defendant's medication to him. However, Dr. Crawford noted that, like at the Institute, the Defendant would not be forced to take his medication at the group home.

Dr. Crawford testified that the Defendant, upon discharge, would be provided psychiatric aftercare and transportation services for his care by the United States Department of Veterans Affairs ("Veterans Affairs"). Dr. Crawford also testified that the Defendant would still have access to the Park Center after his discharge and that the Defendant had agreed to attend Alcoholics Anonymous meetings after he was discharged. In fact, Dr. Crawford noted that the Defendant had already met with a representative from Veterans Affairs to set up his aftercare and obtained a sponsor and meeting schedule for

Alcoholics Anonymous. Dr. Crawford also noted that the Defendant intended to stay at the group home or another group home after the ninety-day furlough ended. Dr. Crawford opined that the Defendant would not "need anything else other than what [he would be] getting at Park Center" and Veterans Affairs. Dr. Crawford acknowledged that continuing treatment with Veterans Affairs and going to Alcoholics Anonymous would be voluntary for the Defendant, but Dr. Crawford testified that he believed that the discharge plan would work for the Defendant.

Dr. Crawford was asked by the State why the Defendant was not being discharged to mandatory outpatient treatment. Dr. Crawford responded that the Defendant had "demonstrated no history of non-compliance," that the Defendant was "willing to take his medications," that the Institute had "never had to force him to take his medicines," and that the Defendant had "never said that he want[ed] to stop them." Put another way, Dr. Crawford responded that the Defendant was not being discharged to mandatory outpatient treatment because he did not "meet the criteria" for imposing that in his discharge plan. Dr. Crawford explained that patients discharged to mandatory outpatient treatment were typically "ones that are refusing to take [their medications], have stopped them at some point in time[,] and relapsed." Dr. Crawford admitted that there "may've been issues" with the Defendant's not having insurance to cover mandatory outpatient treatment and that he believed that mandatory outpatient treatment providers would not accept self-paying patients. However, Dr. Crawford also noted that there was nothing to prevent the Defendant from absconding from the group home or treatment in general even if he was discharged to mandatory outpatient treatment.

At one point, the trial court asked Dr. Crawford if he would "be comfortable if [it] furloughed [the Defendant] to move into [Dr. Crawford's] house and stay there." Dr. Crawford responded that he "would have no reservations whatsoever" because the Defendant had "been one of the most polite, courteous, kind, calm, quiet demeanored patients" that he had known and that he "had heard nothing but good reports from the other staff that [had] interacted with him." Dr. Crawford continued, testifying that the fact that the Defendant might discontinue his medication or relapse did not make him committable under the applicable statutes.

The trial court stated that it was especially concerned that the Defendant would relapse if he stopped taking his medication given the severity of the Defendant's crimes. Dr. Crawford responded that the Defendant was not "more likely to relapse because of the severity of his crime versus . . . other patients that commit lesser crimes" repeatedly. Dr. Crawford testified that the Defendant was "aware and [had] shown remorse and [understood that] he need[ed] to stay on medicine to prevent it from happening again." Dr. Crawford also noted that the Defendant had been "stable for years and years and years" without relapsing back into psychosis. Dr. Crawford admitted that he understood

-7-

the trial court's concerns and stated that was why he "would recommend [that the Defendant] stay on his medication just to be on the safe side."

## B. Clinical Director

Doctor Mohammed S. Jahan testified that he was the clinical director of the Institute. The trial court determined that Dr. Jahan qualified as an expert in psychiatry. Dr. Jahan testified that in his role as clinical director, he supervised the discharge process. Dr. Jahan explained that once a patient's attending psychiatrist recommended that the patient be discharged, he provided a "second opinion," interviewed the patient himself, and reviewed the patient's "paperwork." If Dr. Jahan approved the discharge, then the matter would be sent to "a special committee" at the Tennessee Department of Mental Health and Substance Abuse Services. If the committee approved the discharge, then the Institute's chief executive officer would file the notice of discharge in the appropriate court.

Dr. Jahan testified that he agreed with Dr. Crawford's recommendation to discharge the Defendant because the Defendant no longer met the legal requirements for involuntary commitment. Dr. Jahan further testified that he believed that the Defendant would comply with the Institute's discharge plan. Dr. Jahan based this belief upon the Defendant's "years" of compliance with his treatment at the Institute. Dr. Jahan explained that in deciding whether to approve a patient's discharge, he "seriously" weighed whether a patient had been compliant in taking their medicine and that the Defendant had "always" taken his. Dr. Jahan admitted that he could not guarantee that the Defendant would continue taking his medication upon his discharge, but he thought "that given [his] history [the Defendant would] comply with his medication." Dr. Jahan also noted that the Defendant had "excellent" insight into his illness and was able to serve as a peer counselor to other patients at the Institute.

With respect to the Defendant's discharge plan, Dr. Jahan noted that if there was any "non-compliance" during the ninety-day furlough period, "the whole process would be revoked," and the Defendant "would go back directly" to the Institute. Dr. Jahan testified that after the furlough period, the Defendant would receive free psychiatric care from Veterans Affairs, that he would continue to go to Park Center, and that the Defendant would go to weekly Alcoholics Anonymous meetings and obtain a sponsor.

Dr. Jahan admitted that in 2009, the Institute attempted to discharge the Defendant to mandatory outpatient treatment, but Dr. Jahan could not remember why that attempt involved mandatory outpatient treatment. Dr. Jahan explained that mandatory outpatient treatment was typically used when a patient has a history of "non-compliance [with] medication." Dr. Jahan could not recall why that attempt to discharge the Defendant was withdrawn. Dr. Jahan also admitted that in 2012, a psychiatrist opined that the Defendant

would "require mandatory outpatient treatment" and stated that the Defendant could not receive mandatory outpatient treatment because he was not eligible for TennCare insurance. Despite these prior recommendations, Dr. Jahan testified that he did not believe that the Defendant met the statutory requirements for mandatory outpatient treatment because the Defendant understood the need to continue his treatment and that the Defendant would voluntarily continue his treatment after being discharged.

### C. Social Worker

Jennifer Morgan testified that she was a psychiatric social worker at the Institute and that she assisted in "discharge planning" for the Defendant. Ms. Morgan testified that the Defendant would be furloughed to a residential group home. According to Ms. Morgan, the home was "a supervised residential setting" that would be staffed twenty-four hours a day. Ms. Morgan testified that the Defendant's medications would be kept locked at the home and administered to the Defendant by the home's staff. Ms. Morgan further testified that the home would "provide transportation as needed" to the Defendant but that it was also only fifty feet from a bus stop. According to Ms. Morgan, the Defendant would be free to leave the home after he "sign[ed]-out," but the home did have an 11:00 p.m. curfew. Ms. Morgan testified that she was told the Defendant's rent for the group home would be $800 a month.

Ms. Morgan also explained the difference between aftercare and mandatory outpatient treatment. Mr. Morgan explained that aftercare was "usually provided by a mental health agency in [the] town where [the patient would be] living" if the patient was eligible for TennCare. If the patient had private insurance, the patient "could see a private psychiatrist." Ms. Morgan explained that mandatory outpatient treatment was a form of aftercare that involved "a contract between the patient and the hospital and the [c]ourt," stating that once the patient was discharged they must "follow certain rules" or "they could be sent back to the hospital." Ms. Morgan testified that providers of mandatory outpatient treatment "are usually paid for through TennCare" or private insurance and that they would not accept payment directly from a patient. Ms. Morgan admitted that even if a patient was discharged to mandatory outpatient treatment, there was "no guarantee" that the patient would comply with the terms of the agreement.

Ms. Morgan testified that the Defendant was "not eligible" for mandatory outpatient treatment because he had "too much money" to be "eligible for TennCare." Ms. Morgan explained that the Defendant would receive "Social Security disability income" upon his discharge and that he had approximately $70,000 in different bank accounts. However, Ms. Morgan testified that the Defendant was eligible for aftercare through Veterans Affairs. Ms. Morgan testified that Veterans Affairs would provide the Defendant with psychiatric care and his medication at no cost. Ms. Morgan further testified that Veterans Affairs would provide the Defendant with a social worker to assist

him with "case management services" and would provide free transportation for these services. The Defendant would also be eligible to live in a residential home provided by Veterans Affairs.

Ms. Morgan testified that the Defendant had already applied and been granted "mental health benefits" from Veterans Affairs. Ms. Morgan testified that these benefits would start as soon as the Defendant's ninety-day furlough ended. Ms. Morgan admitted that the Defendant would be responsible for continuing his treatment with Veterans Affairs. However, Ms. Morgan testified that the Defendant had not only applied and been granted these benefits but that he had also already seen a Veterans Affairs psychiatrist to help transition his treatment.

At one point during Ms. Morgan's testimony, the trial judge asked her the following question:

> I won't ask [this] in quite the same way as [I asked the Defendant's] treating psychiatrist because as a woman you wouldn't feel comfortable moving a man that you weren't related to into your home. But if [the Defendant] decides that he's going to relocate from the group home that you'd lined up for him when his [ninety] days [are] up into the house that's next door to wherever you live in Nashville, would you be okay with that?

After asking the trial court to clarify if it was asking her "a personal question," Ms. Morgan responded that she was "not concerned" that the Defendant could move into her neighborhood.

Ms. Morgan explained that she was "very confident that [the Defendant would] succeed once [he was] discharged." Ms. Morgan based this on the Defendant's "past history of being in the hospital for so long and his behavior [having] been so good during [that] time." Ms. Morgan continued, stating that the Defendant had "done so well within his recovery and done very well out in the community with Park Center" and that given all of this, she felt that the Defendant "would manage very, very well out in the community once [he was] discharged."

Ms. Morgan expanded on some aspects of the Defendant's current treatment. Ms. Morgan noted that the Defendant managed the Institute's "drop-in center," which she described as "a place for the patients [to] go to talk" and get "refreshments." The Defendant also served as a peer counselor to the other patients. Ms. Morgan further testified that the Defendant received "group counseling, drug and alcohol therapy," and vocational training at Park Center. Ms. Morgan stated that the Defendant had expressed an interest in continuing to go to Park Center after his discharge. Ms. Morgan also answered the trial court's questions about whether the portion of the Institute that housed

the Defendant was "a fenced in facility." Ms. Morgan testified that it was not, that the Defendant had "privileges to walk around [the grounds] unescorted," and that he could "abscond from [the] facility" "if he wanted to."

### D. Independent Psychiatrist

Doctor Bradley Freeman testified that he was a member of the faculty at the Vanderbilt University School of Medicine in the Department of Psychiatry. Dr. Freeman was offered as an expert in psychiatry. Dr. Freeman testified that he performed a forensic evaluation on the Defendant at the request of the Defendant's attorney. Dr. Freeman opined that the Defendant was not currently committable. Dr. Freeman testified that the Defendant stated that he did not remember specific details of the murders. Dr. Freeman noted that, at the time of the murders, the Defendant was not being treated or on medication for his mental illness. Dr. Freeman also deemed the Defendant's substance abuse at the time of the murders as "very significant."

Dr. Freeman noted that the Defendant had a "lack of previous criminal charges," lived with his family until he was seventeen, "had a steady relationship for a long period of time," and was honorably discharged from the military prior to the murders. Dr. Freeman also noted that the Defendant "had met all the treatment plan goals" that had been set for him at the Institute and had done so "for some period of time." Dr. Freeman testified that "two previous outside evaluators," one in 1995 and one in the early 2000s, had determined that the Defendant "was no longer committable."

Dr. Freeman scored the Defendant as an "extremely low risk" of violently reoffending using the "Violence Risk Appraisal Guide." Dr. Freeman testified that the Defendant's score suggested that there was a ten percent chance of the Defendant's violently reoffending within the next ten years. Dr. Freeman characterized the Defendant's score as "one of the lowest risk assessments" he had seen. Dr. Freeman acknowledged that his scoring differed from the assessment performed by the Institute in the mid-2000s. However, Dr. Freeman noted that the major difference between the two assessments was that he did not believe that the Defendant suffered from a personality disorder. Dr. Freeman opined that his assessment was more accurate.

Dr. Freeman was asked about his view of the discharge plan the Institute had prepared for the Defendant. Dr. Freeman described the plan as "very comprehensive," "a good plan," "very reasonable," and "appropriate" for the Defendant. Dr. Freeman was also asked if he had any concerns about the Defendant's "being discharged from the hospital." Dr. Freeman responded that his concerns focused "on just [the Defendant's] continued treatment and his abstinence from substance abuse." Dr. Freeman explained that he wanted the Defendant to "continue to take his medication." Dr. Freeman also

stated that the Defendant's "being in some kind of supervised housing [was] certainly appropriate."

However, Dr. Freeman testified that he understood that the Defendant "would not be under anybody's thumb" after his ninety-day furlough and that, despite his concerns, he still believed "that the discharge plan was reasonable." Dr. Freeman further testified that he was confident that the Defendant "would stay abstinent and on his medication" given the Defendant's age and "his [twenty] plus years of doing well" at the Institute. Dr. Freeman characterized the Defendant's motivation to continue his treatment as high. Dr. Freeman opined that the Defendant had "good insight" into his illness and the need to continue treatment. Dr. Freeman explained that the Defendant was "not the type of patient that [was] incapacitated by his mental illness such that he [would need] such close supervision that [he] would be concerned after [ninety] days." Dr. Freeman concluded that he had "very little concern" about the Defendant's discharge plan.

On cross-examination, Dr. Freeman testified that the seriousness of the Defendant's offenses and his mental illness at the time of the offenses "certainly play[ed] . . . a role" in his recommending that the Defendant continue his treatment after he was discharged. Unlike Dr. Crawford, Dr. Freeman testified that "there [was] no question" that the Defendant needed to stay on his medication because "there is no cure for psychosis." Dr. Freeman was asked on cross-examination if it was his opinion that the Defendant "would need mandatory outpatient treatment" to insure that he stayed on his medication and abstained from substance abuse. Dr. Freeman responded that mandatory outpatient treatment "was one of [his] recommendations" and that he felt "like that would be important."

Dr. Freeman's report was entered into evidence at the hearing. After concluding that the Defendant did not meet the criteria for involuntary commitment, that he was a low risk for violent behavior, and that he was a "low-moderate" risk for substance abuse, Dr. Freeman made the following recommendation:

[The Defendant] must be engaged in aftercare.

[The Defendant's] treatment team recommended he be involved in aftercare treatment. [The Defendant] has already met with a representative of Mental Health Coop for mandatory outpatient monitoring. He acknowledges the need for continued care and continued medication. His medical record indicated he has been taking steps in arranging for this level of care if discharged. In addition to Mental Health Coop, [the Defendant's] status as an honorably discharged veteran makes him eligible for services through [Veterans Affairs]. His social worker noted [the Defendant] is being

established with [Veterans Affairs] for future medical and mental health needs.

*E. Residential Group Home Owner*

Bernard Bean testified at the hearing via telephone. Mr. Bean testified that he was the owner of the residential group home listed in the Defendant's discharge plan. Mr. Bean explained that his facility had room for eight people and that, at the time of the hearing, he had seven. Mr. Bean testified that most of the residents in the home were schizophrenics. Mr. Bean described the services he provided to the residents of his group home, stating that he and his employees provided "three meals [a] day," assisted "with doctors' appointments," assisted them with their medications, washed their clothes, and kept "them interactive . . . [by] doing different things." Mr. Bean testified that he would also assist the Defendant in getting to and from Park Center if the Defendant did not feel comfortable taking the bus.

Mr. Bean stated that he had two employees who lived and worked in the home. Mr. Bean also testified that while he had an 11:00 p.m. curfew, the residents were free to come and go. Mr. Bean further explained that the residents are typically asked by one of the staff where they are going and to provide an estimate of when they will be back before they leave the home. Mr. Bean testified that the goal of his home was to transition the residents back to independent living.

Mr. Bean testified that he was aware that the Defendant had killed two people when he accepted the Defendant into the residential group home but that he did not know the details of the murders. Mr. Bean also testified that he did not know that the Defendant would be on a ninety-day furlough until he spoke to the assistant district attorney the day before his testimony. Mr. Bean testified that the Defendant would have to sign a rental agreement before he could move into the home. After speaking to the assistant district attorney, Mr. Bean decided to raise the Defendant's rent from $800 to $2,000 a month, claiming that the increase was due to the fact that the Defendant would require "more one-on-one" attention than his other residents. Mr. Bean also admitted that he increased the rent because the assistant district attorney told him that the Defendant "had a lot of money in savings."

Mr. Bean explained that the rent he charged was based upon the resident's income to try "to make it a win-win situation" for himself and his residents because the group home was "still a business." Mr. Bean claimed that Ms. Morgan did not tell him how much money the Defendant had in savings when they originally agreed that the rent would be $800 a month. However, Mr. Bean denied that he became "upset" when the assistant district attorney told him about the Defendant's savings.

The Defendant's younger sister, Debra Doris Clark, testified in opposition to the Defendant's discharge. Ms. Clark testified that the Defendant was "a lot of fun" as a child but that "he changed a little bit" after an accident he had when he was a teenager. Ms. Clark explained that the Defendant was "electrocuted and got a concussion" while he was working as a lifeguard and, after that, he "was quieter" and "not his usually, happy, jollyful [sic] self." Ms. Clark recalled that the week before the murders, the Defendant came to her house "acting very strange." The Defendant asked Ms. Clark's then-husband "if he was ready to meet his maker" and then went upstairs to look for Ms. Clark's then-two-year-old son. Ms. Clark's son was asleep in his bed, but the Defendant could not find the boy's bedroom. Ms. Clark testified that she was not surprised when she heard that the Defendant had killed her father and stepmother because of "the way he was acting and what he did to [her]." Ms. Clark explained that "[the Defendant] had sexually abused [her]" when she was twelve.

Ms. Clark testified that she had visited the Defendant at the Institute a few times at their mother's request. Ms. Clark stated that she "was relieved" when the Defendant was committed "as long as he never got out." Ms. Clark questioned the Defendant "[w]hen he started saying he wanted out." Ms. Clark explained that she would never want to be released if she had murdered someone. Ms. Clark asked the Defendant why he wanted to be discharged, but he "didn't answer" her. Ms. Clark testified that she was afraid that the Defendant would move back to the Morristown area because their mother lives nearby. Ms. Clark said that she warned the Defendant that "if he ever did get out and he came up [there], he'd be looking down the end of a gun."

The Defendant's step-sister, Diana Horner, also testified in opposition to his discharge. Ms. Horner testified that she lived near the Defendant as a child and that she remembered the Defendant being a quiet, "normal child." Ms. Horner explained that her mother and the Defendant's father were neighbors, had an affair, eventually divorced their respective spouses, and got married to each other. Ms. Horner testified that her mother and the Defendant's father had been married for twenty years when they were killed. Ms. Horner recalled that the Defendant would not visit his father and stepmother often, explaining that "it was usually [when] he had an excuse, like, [he] needed money or something." Ms. Horner testified that she has had no contact with the Defendant since his commitment. Ms. Horner further testified that she is scared of the possibility of the Defendant's discharge and that she is afraid that he would come back to the area to visit his mother.

The Defendant's half-sister, Jhounna Pruitt, also testified in opposition to the Defendant's discharge. Ms. Pruitt testified that she was the daughter of the Defendant's father and stepmother. Growing up, Ms. Pruitt recalled the Defendant's visiting from

time to time and an incident when the Defendant lived with them "for a little bit" after he was involved in a car accident. Ms. Pruitt testified that two days before the murders, the Defendant visited his father and stepmother to tell them that "he had gotten saved and he wanted to ask them forgiveness for everything in the past and he wanted to become a family." Ms. Pruitt testified that except for a Christmas card the Defendant sent her in 1999, she had no contact with the Defendant since his commitment. Ms. Pruitt further testified that she was scared about the prospect of the Defendant's discharge and afraid that he would "be after [her] next." Ms. Pruitt explained that she was "the affair baby" and was afraid that the Defendant blamed her for causing his parents' divorce. Ms. Pruitt further explained that the Defendant had written a "forgiveness letter" to his other siblings but never wrote one to her.

### V. The Defendant's Family Members Supporting His Discharge

The Defendant's older sister, Jean Ann Stubblefield, testified in support of the Defendant's discharge. Ms. Stubblefield recalled that the Defendant exhibited "bizarre behaviors" and claimed to have experienced a religious conversion shortly before the murders. Ms. Stubblefield also recalled that the night before the murders their mother fled her house out of fear of the Defendant. Ms. Stubblefield testified that she had maintained contact with the Defendant throughout the years and that she had "seen a major, major change in [his] life." Ms. Stubblefield explained that the Defendant was "really better now than [she had] ever known him to be," that he was "more stable and solid and calm and steady," and that he had come "to a sense of who his person is."

Ms. Stubblefield testified that she had "many conversations" with the Defendant about his possible discharge and his need to continue his treatment. Ms. Stubblefield told the trial court that the Defendant was "very proactive about working the plan and staying with the plan." Ms. Stubblefield claimed that the Defendant would reiterate to her that he did not "want anything to do with alcohol." Ms. Stubblefield also claimed that the Defendant realized what it would "take to straighten it out and walk a straight line" and that was "what he want[ed] to do." Ms. Stubblefield further testified that the Defendant had told her "many times" that he intended "to continue taking his medicine." Ms. Stubblefield told the trial court that she would maintain "[l]ots of contact" with the Defendant if he were discharged and would report the Defendant if he began to behave strangely again.

Ms. Stubblefield's husband, Craig Stubblefield, also testified in support of the Defendant's discharge. Mr. Stubblefield testified that he had visited the Defendant at the Institute with his wife. Mr. Stubblefield told the trial court that the Defendant had "grown calmer and more peaceful through the years." Mr. Stubblefield testified that he believes the Defendant is "ready to step out and go back into society." Mr. Stubblefield further testified that the Defendant could move into his house. However, Mr.

Stubblefield testified that the Defendant told him that he did not want to return to the Morristown area.

The Defendant's older brother, Campbell Cloar, also testified in support of his discharge. Mr. Cloar testified that he had maintained contact with the Defendant throughout the years and that he had noticed "a huge change" in the Defendant. Mr. Cloar further testified that he was confident that the Defendant would continue his treatment and medication upon his discharge because the Defendant had shown "determination to do everything . . . necessary."

*VI. The Defendant's Testimony*

The Defendant stated that he was sixty years old at the time of the hearing. The Defendant testified that he did not think that any of the other patients at the Institute had been there longer than him. The Defendant further testified that during his twenty-three years at the Institute he had been granted a significant number of privileges. The Defendant explained that he had "access to [go] outside from one end of the parking lot to the other end . . . and around the grounds." The Defendant further explained that he could easily have abused these privileges by having someone bring him contraband or "just take off" but that he had never done so. The Defendant also explained that it was unusual for a patient to be allowed to go off site to Park Center. The Defendant testified that he had been going to Park Center for four or five years.

The Defendant testified that he was dropped off and picked up at Park Center by "[t]he State" van. The Defendant told the trial court that his time at Park Center had "helped [him] socialize more" and learn skills he would need after his discharge. The Defendant further stated that he had taken classes there on clerical and computer skills, as well as training on how to use the Nashville mass transit system. The Defendant testified that he had also been taught at Park Center about the need to "have a plan in place" in case he started "feeling funny mentally." The Defendant told the trial court that, if he was discharged, he wanted to continue going to Park Center until he found a job. The Defendant testified that during his commitment, he had several different jobs at the Institute. The Defendant stated that he started with cleaning toilets, moved on to working in the commissary, and eventually to managing the "drop-in" center. The Defendant also testified that he had participated in Alcoholics Anonymous while he was at the Institute until that program was discontinued there and that he looked forward to participating in it again after his discharge.

The Defendant testified that he did not know before the murders what was happening to him. The Defendant explained that he thought he was having a religious experience. The Defendant also stated that he did not remember the offenses or what he told the police afterwards. The Defendant described that day as "the worst day of [his]

life" and that he felt "really bad, remorseful that [he] caused such a tragedy." The Defendant expanded on that, saying that he also "felt guilt, embarrassment, [and] humiliation." The Defendant testified that he accepted his illness and would "definitely" continue his medication if he were discharged. The Defendant explained that he understood that his medication kept him "calm" and "stable" and his "thoughts orderly." The Defendant further explained that he did not want to go through psychosis again and that he had "come too far mentally and emotionally to mess with . . . missing medication." The Defendant further testified that he would "call the crisis line" or go to an emergency room if he was "not feeling [him]self."

The Defendant told the trial court that he believed that his behavior at the Institute demonstrated that he could successfully live independently. The Defendant further stated that he complied with his treatment and medication because he wanted his disease to remain in remission and that he would continue to comply if he was discharged. The Defendant testified that he had already met with Veterans Affairs and had seen a psychiatrist to transition to aftercare. The trial court asked the Defendant if Veterans Affairs would "draw blood regularly" to test his medication levels. The Defendant responded that he did not know and that the Institute did not do blood tests to check his medication levels. The Defendant admitted that he had mistakenly been drawing "Social Security disability income" while he was committed and that he would have to pay back $21,900 upon his discharge. The Defendant was asked on cross-examination why he was not being placed in "supervised living" offered by Park Center. The Defendant stated that he did not know why, and the trial court commented that Park Center "sounded more like what we were looking for, transition." The Defendant responded that he would not leave the group home until he got his "bearings and all that."

*VII. Closing Matters and the Trial Court's Ruling*

At the conclusion of the evidence, the attorney for the Tennessee Department of Mental Health and Substance Abuse Services noted that the prior judge "was vocal and frank about his opinions about the [Institute's] request" for the Defendant's discharge and that was likely why prior plans involved the Defendant's being discharged to mandatory outpatient treatment. The attorney also stated that mandatory outpatient treatment was sometimes given "more value [than] it really has" because it did "not make a person with a mental illness necessarily anymore likely to comply with taking their medications." At that point, the trial court stated that it wanted "the equivalent of a probation officer" or "parole officer" for the Defendant to ensure that the Defendant was taking his medication. The trial court continued, stating that it wanted "somebody that's jerking [the Defendant's] chain every once in a while."

Prior to ruling, the trial court addressed the standard of review it would apply. The trial court noted that the applicable statute required it to find "by clear, unequivocal,

-17-

and convincing evidence" that the Defendant was not eligible for discharge. The trial court stated that as far as it knew, "we don't have a separate standard for unequivocal evidence in Tennessee." The trial court stated that it thought the term "unequivocal" was "surplusage" and that it would decide this case "on [the] clear and convincing standard." The trial court further stated that it was "not familiar with the clear, unequivocal, and convincing standard as being any different than just a clear and convincing standard." None of the parties objected to the trial court's interpretation of the standard of review.

In ruling, the trial court stated that it was to the Defendant's "great credit" that there had been "no incidents" during his twenty-three years of commitment. The trial court also acknowledged that the Defendant did not meet the statutory requirements for a mandatory outpatient treatment discharge because "all the folks that [dealt] with [the Defendant] at the mental health facility [said] he [was] likely to participate in outpatient treatment without any legal obligation" and that they felt that the Defendant was "self-motivated at this point." The trial court stated that it did not "fault" the staff of the Institute for proposing that the Defendant be discharged because they were "doing exactly what the legislature told them to do" based upon the applicable statutes. However, the trial court stated that its role was different from "the folks in charge of his psychiatric treatment."

The trial court stated that it placed great weight on Dr. Freeman's testimony that "there's no cure to psychosis" and that the Defendant had "to stay on his medicine and [had] to stay off abusing alcohol or other drugs." Based upon that, the trial court deemed that it had "to have a plan which [had] some accountability on making sure" the Defendant continued taking his medication and abstained from substance abuse. The trial court stated that it did not "know what that [type of plan would look] like." The trial court stated that it wanted "a social worker coming to the [Defendant's] house and doing a pill count and . . . taking a blood draw." The trial court then ruled as follows:

> [T]he presumption of release on the plan that the [c]ourt's been provided is rebutted by the severity of the psychosis that [the Defendant had] experienced in the past and the results of that psychosis, which was the two murders, the relatively low risk of that occurring again based upon Dr. Freeman's testimony, to me means [the Defendant was] ready to be released if we have the safeguards in place. But because there are no safeguards in place in my view on the current plan, I think the presumption of release has been rebutted by the State at this point.

The trial court then took questions from the audience. In answering questions from Ms. Stubblefield, Mr. Stubblefield, and Mr. Cloar on what, if anything, could be done to secure the Defendant's discharge, the trial court stated that it would approve a plan where the Defendant moved "in with Dr. Crawford for the next six months" but that

"Dr. Crawford [was not] offering his house even though he [said] he'd be comfortable with it." The trial court also stated that the ninety-day furlough period was "no transition." The Defendant then appealed to this court pursuant to Tennessee Code Annotated section 33-6-708(c)(5).

ANALYSIS

The Defendant contends that the trial court erred in finding that he was ineligible for discharge. The Defendant argues that the trial court applied the wrong standard of review and that his ineligibility for the proposed discharge plan was not established by clear, unequivocal, and convincing evidence. The Defendant further argues that the trial court's discussion of mandatory outpatient treatment was misplaced because he did not meet the criteria for that type of discharge. The Defendant specifically cites to the fact that there was no evidence that he would fail to participate in outpatient treatment unless legally obligated to do so. The State responds that there is no evidence that the Defendant would be likely to participate in outpatient treatment without being legally obligated to do so. The State argues that the Defendant's compliance with his treatment and medication for the past twenty-three years is of no merit because it was "legally obligated" and that the Defendant "has never lived independently while managing and treating his delusion disorder and his drug and alcohol addiction." We find that the State's argument is not well-taken.

We review the trial court's decision in this matter de novo with a presumption of correctness "unless the preponderance of the evidence is otherwise." State v. Groves, 735 S.W.2d 843, 844 (Tenn. Crim. App. 1987). The Defendant was found not guilty by reason of insanity for the underlying murders and involuntarily committed by the trial court pursuant to Tennessee Code Annotated section 33-7-303(c).

The United States Supreme Court has held that the "purpose of commitment following an insanity acquittal . . . is to treat the individual's mental illness and protect him and society from his potential dangerousness." Jones v. United States, 463 U.S. 354, 368 (1983) (quoting Jackson v. Indiana, 406 U.S. 715, 738 (1972)) (internal quotation marks omitted). The Due Process Clause of the United States Constitution "requires that the nature and duration of commitment bear some reasonable relation" to that purpose. Id. As such, "[t]he committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous." Id.

To that end, Tennessee Code Annotated section 33-6-706 provides for discharge of an involuntarily committed patient when "the person . . . has a mental illness . . . in remission" and, if "the person would pose a likelihood of serious harm . . . unless treatment is continued," "voluntary outpatient treatment is a suitable less drastic alternative to commitment because the person is likely to participate in outpatient

-19-

treatment without being legally obligated to do so." (Emphasis added). A "substantial likelihood of serious harm" occurs when a person either (1) "has threatened or attempted suicide or to inflict serious bodily harm," (2) "has threatened or attempted homicide or other violent behavior," (3) "has placed others in reasonable fear of violent behavior and serious physical harm to them," or (4) "is unable to avoid severe impairment or injury from specific risk," and "there is a substantial likelihood that the harm will occur unless the person is placed under involuntary treatment." Tenn. Code Ann. § 33-6-501.

While not pertinent to our review, discharge to mandatory outpatient treatment was discussed at length in the trial court. Tennessee Code Annotated section 33-6-602 provides for discharge "subject to the obligation to participate in any medically appropriate outpatient treatment . . . under a plan approved by the releasing facility and the outpatient qualified mental health professional." This type of discharge is available if (1) "the person . . . has a mental illness . . . in remission," (2) "the person's condition resulting from mental illness . . . is likely to deteriorate rapidly to the point that the person will pose a likelihood of serious harm . . . unless treatment is continued," (3) "the person is likely to participate in outpatient treatment with a legal obligation to do so," (4) "the person is not likely to participate in outpatient treatment unless legally obligated to do so," and (5) "mandatory outpatient treatment is a suitable less drastic alternative to commitment." Tenn. Code Ann. § 33-6-602(1) (emphases added).

There was significant confusion in the trial court about the application and scope of mandatory outpatient treatment. Mandatory outpatient treatment is the only type of discharge available when "voluntary outpatient treatment is not a suitable less drastic alternative to commitment because the person is not likely to participate in outpatient treatment without being legally obligated to do so." Tenn. Code Ann. § 33-6-707. "[T]he term outpatient involves the patient leaving the treatment facility rather than residing there." State v. Sandra Lynn Baumgartner, No. W2003-00038-CCA-R3-CD, 2003 WL 21383208, at *8 (Tenn. Crim. App. Apr. 14, 2003). Therefore, even when a defendant is discharged to mandatory outpatient treatment, "requiring the defendant to live in a group home or halfway house that provides twenty-four-hour supervision is not consistent with outpatient treatment." Id. Similarly, this court has previously struck down a requirement in a mandatory outpatient treatment plan that a defendant's "medication be supervised at least five days per week" when the record contained "no evidence that the defendant [had] ever been remiss in taking her own medication." Id. at *10.

Because the Defendant was committed involuntarily by the trial court, his discharge was subject to judicial review pursuant to Tennessee Code Annotated section 33-6-708. Section 33-6-708(c)(1) provides that "[w]hen the chief officer [of the committing institution] determines that the person is eligible for discharge under . . . §

33-6-706, the chief officer shall notify the committing court of that conclusion[ and] of the basis for it[.]" "The determination by the chief officer shall create a rebuttable presumption of its correctness." Tenn. Code Ann. § 33-6-708(c)(1). The trial court may, "on its own motion or that of the district attorney general, order a hearing to be held" on the matter. Id. "Following the hearing, if the court finds by clear, unequivocal, and convincing evidence that the person is not eligible for discharge under . . . § 33-6-706, it shall order the person's return to the hospital under the original commitment." Tenn. Code Ann. § 33-6-708(c)(4) (emphasis added). Otherwise, the trial court "shall order the person's release from involuntary commitment in accordance with the recommendations of the chief officer." Id.

At the outset, we note that the trial court applied the wrong standard of review in this matter. "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Arroyo v. State, 434 S.W.3d 555, 559 (Tenn. 2014) (quoting Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009)) (internal quotation marks omitted). "In order for evidence to be clear and convincing, it must eliminate any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Id. (quoting State v. Sexton, 368 S.W.3d 371, 404 (Tenn. 2012)) (internal quotation marks omitted). The term "unequivocal" as used in section 33-6-708(c)(4) is not mere surplusage to be ignored as the trial court did here. Nor is it "to be taken literally." Groves, 735 S.W.2d at 846. Instead, the term "unequivocal" "raises the level of the clear and convincing standard" to beyond clear and convincing but less than beyond a reasonable doubt. Id. Regardless of this heightened standard, "it is not necessary" that the evidence seeking to rebut the presumption of correctness given to the chief officer's discharge decision "be expert testimony." Id.

The operative question is whether there was clear, unequivocal, and convincing evidence that the Defendant was not eligible for discharge under section 33-6-706. None of the parties dispute that the Defendant has a mental illness in remission and that the Defendant would pose a likelihood of serious harm unless treatment is continued. Therefore, the focus of our inquiry is whether "voluntary outpatient treatment is a suitable less drastic alternative to commitment because the person is likely to participate in outpatient treatment without being legally obligated to do so." Tenn. Code Ann. § 33-6-706(1)(C)(ii). There is nothing in the record before us to suggest that the Defendant would not voluntarily continue outpatient treatment without being legally obligated to do so. The trial court recognized as much at the conclusion of the hearing.

Still, the trial court denied the Defendant's discharge on the basis of the severity of the Defendant's past psychosis, the severity of the Defendant's crimes, and the fact that there were "no safeguards in place" to monitor the Defendant upon his discharge. There is no doubt that at the time of the offenses the Defendant suffered from a severe mental

illness and that his crimes were horrific. However, this court has previously held that a defendant's untreated past behavior alone did not provide clear, unequivocal, and convincing evidence sufficient to deny a defendant's discharge. State v. Jackie H. Martin, No. 02C01-9512-CR-00374, 1996 WL 687028, at *4 (Tenn. Crim. App. Dec. 2, 1996). Therefore, those were not proper grounds for denying the Defendant's discharge.

The trial court's other basis for denying the Defendant's discharge, that there were "no safeguards in place," rested on Dr. Freeman's testimony that "there's no cure to psychosis" and that the Defendant needed to continue his medication and abstain from substance abuse. During cross-examination, Dr. Freeman was asked if the Defendant "would need mandatory outpatient treatment" to insure that he stayed on his medication and abstained from substance abuse. Dr. Freeman responded that mandatory outpatient treatment "was one of [his] recommendations" and that he felt "like that would be important."

However, Dr. Freeman's report stated that the Defendant "must be engaged in aftercare." The report noted that the Defendant was attempting to arrange mandatory outpatient treatment but also noted that the Defendant was "eligible for services" through Veterans Affairs and that the Defendant was "being established with [Veterans Affairs] for future medical and mental health needs." Furthermore, Dr. Freeman described the Defendant's discharge plan as "very comprehensive," "a good plan," "very reasonable," and "appropriate" for the Defendant. Dr. Freeman testified that he understood that the Defendant "would not be under anybody's thumb" after the furlough. Dr. Freeman reiterated that he had "very little concern" about the discharge plan and that he thought it "was reasonable."

We do not think that Dr. Freeman's brief statement during cross-examination about mandatory outpatient treatment was sufficiently clear, unequivocal, and convincing to overcome the rebuttable presumption of the discharge's correctness. This is especially true in light of the fact that Dr. Freeman testified that he was confident that the Defendant would voluntarily continue his treatment given his high motivation to do so, "his [twenty] plus years of doing well" at the Institute, and his insight into his illness. Dr. Freeman's testimony on this matter echoed that of Dr. Crawford, Dr. Jahan, and Ms. Morgan, all of whom were confident that the Defendant would voluntarily continue his treatment and medication. Likewise, Ms. Stubblefield, Mr. Stubblefield, and Mr. Cloar all testified that they believed the Defendant would voluntarily continue treatment. While Ms. Clark, Ms. Horner, and Ms. Pruitt all testified in opposition to the Defendant's discharge, they did not present any evidence that the Defendant would not voluntarily continue his treatment upon discharge. In fact, on this operative question, there is nothing in the record to suggest that the Defendant would not voluntarily comply with his treatment and medication upon his discharge.

-22-

The problem with the trial court's denial on the grounds that there were "no safeguards in place" in the proposed discharged plan is that the applicable statute enacted by our legislature does not provide for <u>any</u> post-discharge supervision so long as "the person is <u>likely</u> to participate in outpatient treatment without being legally obligated to do so." Tenn. Code Ann. § 33-6-706(2)(C)(ii) (emphasis added). The lack of safeguards that are not provided for in the statutory scheme cannot be the basis for rebutting the presumption of the discharge plan's correctness or the Defendant's eligibility for discharge under section 33-6-706. Put another way, the discharge plan cannot be rejected for failing to provide safeguards that the applicable statute does not require or address.

On appeal, the State argues that there is no evidence that the Defendant would be likely to participate in outpatient treatment without being legally obligated to do so because the Defendant has been "legally obligated" to comply with his treatment at the Institute and because he has not previously "lived independently" while managing his mental illness. We disagree. All of the experts who testified at the hearing relied on the Defendant's compliance with treatment while he was committed as a major indicator of whether he would continue to comply with treatment after discharge. Furthermore, the State's argument that likeliness to participate in outpatient treatment voluntarily could only be shown by a patient's previously having done so ignores the expert testimony to the contrary and would effectively require all patients to be discharged via mandatory outpatient treatment before qualifying for discharge under section 33-6-706.

The State also argues that the Defendant's "expression of an intent to continue his medication and treatment—[] even if genuine and sincere—is insufficient, standing alone, to support a conclusion" that he was eligible for discharge under section 33-6-706. However, this court has previously held that a defendant's testimony is "highly essential to a decision of the magnitude involved in his release into a free society." <u>State v. Tripp</u>, 754 S.W.2d 92, 95 (Tenn. Crim. App. 1988). The Defendant was adamant during his testimony that he understood the need to continue his treatment and medication, as well as his determination to continue his treatment so that he could successfully live independently.

Moreover, there was ample evidence of the Defendant's preparations to continue his treatment. The Defendant had already established himself as a patient with Veterans Affairs and seen a Veterans Affairs psychiatrist. The Defendant had also arranged to attend Alcoholics Anonymous meetings and obtained a sponsor. The Defendant had gone to Park Center four days a week for four or five years where he took classes to prepare for his transition back to independent living. The Defendant also took classes on having a plan in place in case he relapsed back into his illness. Furthermore, the Defendant's discharge plan included a ninety-day furlough to a residential group home despite the fact that neither of these precautions are required by the applicable discharge

-23-

statute or the mandatory outpatient treatment statute. In fact, the Defendant testified that he intended to stay at a residential group home even after the furlough period ended and until he was able to get his "bearings and all that."

In light of the evidence presented at the hearing that the Defendant would voluntarily continue treatment after discharge, we conclude that there was no evidence rising to the level of clear, unequivocal, and convincing that rebutted the presumption of correctness granted to the discharge plan. The State and the trial court's focus on transitioning the Defendant and "a plan which [had] some accountability" were misplaced. We understand and sympathize with their concerns. However, "the statutory scheme reflects the considered judgment of the state legislature as to the proper balance between the need to protect the public from the person while at the same time protecting the person from unjustified detention." State v. Kenneth Ryan Mallady, No. M2010-02142-CCA-R3-CD, 2012 WL 76901, at *8 (Tenn. Crim. App. Jan. 10, 2012). Section 33-6-706 focuses on whether a defendant "is likely to participate in outpatient treatment without being legally obligated to do so" rather than the State and the trial court's concerns. The Defendant's likeliness to voluntarily participate in outpatient treatment was overwhelmingly established at the hearing. Accordingly, we reverse the judgment of the trial court.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is reversed. We remand this case for entry of an order, pursuant to Tennessee Code Annotated section 33-6-708(c)(4), discharging the Defendant from involuntary commitment "in accordance with the recommendation of the chief officer."

_____
D. KELLY THOMAS, JR., JUDGE